# NATIONAL LABOR RELATIONS BOARD *v.* ROCKAWAY NEWS SUPPLY CO., INC.

No. 318.  Argued January 14, 1953.—Decided March 9, 1953.

*Frederick U. Reel* argued the cause for petitioner. With him on the brief were *Solicitor General Cummings, George J. Bott, David P. Findling* and *Mozart G. Ratner.*

*Julius Kass* argued the cause for respondent. With him on the brief was *Harry S. Bandler.*

Briefs of *amici curiae* urging reversal were filed by *J. Albert Woll, Herbert S. Thatcher* and *James A. Glenn* for the American Federation of Labor; *Arthur J. Goldberg* for the Congress of Industrial Organizations; and *Stephen C. Vladeck* and *Sylvan H. Elias* for the Newspaper and Mail Deliverers' Union of New York and Vicinity.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The Court of Appeals has set aside the National Labor Relations Board's order that Rockaway News Supply Co. reinstate one Charles Waugh as a chauffeur and routeman and make him whole for an unlawful discharge. The court below was divided,[1] and we granted certiorari.[2]

Waugh had been employed by respondent about seven years. His duty was to drive a truck along a regular route to pick up and deliver certain newspapers and other publications. One of his scheduled stops was at

---

[1] 197 F. 2d 111.

[2] 344 U. S. 863.

the Rockville Center plant of The Daily Review Corporation, publisher of the Nassau Daily Review, consignments of which he was to pick up and deliver to various retail dealers. Waugh, like all others similarly employed by respondent, was a member of the Newspaper and Mail Deliverers' Union of New York and Vicinity. For some years respondent had recognized this union as the exclusive bargaining representative of its employees, without the formality of an election. It had an employment contract bargained with this union which contained a union-security clause not conditioned upon a vote of the employees under § 9 (e) of the Labor Management Relations Act, an omission which raised questions as to the validity of the clause and of the contract as a whole.

The Nassau County Typographical Union No. 915, A. F. L., of which Waugh was not a member, established a picket line about the premises of The Daily Review Corporation which, on March 2, 1950, prevented a pickup of its newspaper except by passing through the picket line. Waugh assured himself that the line was ordered by the Typographical Union in connection with a labor dispute. He then informed his foreman that, because he was himself a union man, he would not cross the picket line of another union. He was advised not to take that attitude and was told "It might mean your job." Waugh insisted that he would not do harm to another union and asked to have the papers somehow delivered to him outside of the picket line. This was done for two days, but the following day he was ordered to cross the line and get the papers—"Otherwise you are fired; if you refuse, you are fired." Waugh left the premises but returned daily for three weeks seeking reemployment which was refused. Waugh had been willing to perform all duties provided he was not required personally to cross the picket line.

The other drivers were also members of the same union as Waugh, but only he refused to cross the line. Waugh's union had a collectively bargained contract with respondent which provided against strikes, lockouts, other cessation of work or interference therewith except as against a party failing to comply with a decision, award, or order of the Adjustment Board for which it provided. The union initiated an arbitration thereunder and the Adjustment Board, on March 31, 1950, made an award in favor of respondent.[3] Waugh then filed the charge of unfair labor practice and the General Counsel initiated these proceedings.

---

[3] "The undersigned, constituting the members of the Board of Adjustment, designated in accordance with the agreement between the parties, having heard the proof and allegations, award as follows: Under Section 4 of the agreement between the parties, it is the obligation of an employee to comply with orders of the foreman, and if such orders are objectionable to him personally, to have the issues discussed and brought to arbitration in accordance with the procedure set forth therein. He may not, in the first instance, refuse to obey the order merely because it is personally distasteful to him, unless it is the type of order which might subject him to physical danger or be contrary to public policy.

"Of course, the order which the employee here refused to obey cannot be held to have been against public policy (and concededly it does not physically endanger him) particularly since the union had knowingly refrained from taking any position and the act required was willingly performed without objection by six other employees who were members of the union. In addition, the contract between the parties does not specifically permit the refusal by the employee to comply with such an order although other contracts in the industry do contain such a provision.

"Consequently it must be ruled that the act of Charles Waugh in refusing to obey the order of the foreman on March 7, 1950, constituted just cause for discharge. Signed, I. Robert Feinberg, Impartial Chairman; John Somyak, John Fylstra."

Thereunder is stated "The members of the Adjustment Board designated by the Union dissent from this award, dated, New York, New York, March 31, 1950."

The parties here see the case as requiring decision of sweeping abstract principles as to the respective rights of employer and employee regarding picket lines. But this decision does not, and should not be read to, declare any such principles. The actual controversy here is within a very narrow scope, so narrow that the Board in its opinion said:

> "Although Waugh's refusal to cross the picket line was a protected activity, the Respondent, as a normal incident of its right to maintain its operations, could have required Waugh to elect whether to perform all his duties or, as a striker, to vacate his job and make way for his replacement by the Respondent. Instead the Respondent discharged Waugh."

The Court of Appeals said, "We cannot follow the Board's reasoning." Nor can we. The distinction between discharge and replacement in this context seems to us as unrealistic and unfounded in law as the Court of Appeals found it. This application of the distinction is not sanctioned by *Labor Board* v. *Mackay Co.,* 304 U. S. 333, 347. It is not based on any difference in effect upon the employee. And there is no finding that he was not replaced either by a new employee or by transfer of duties to some nonobjecting employee, as would appear necessary if the respondent were to maintain the operation. Substantive rights and duties in the field of labor-management do not depend on verbal ritual reminiscent of medieval real property law.

In this case there is no finding, evidence or even charge that the dismissal of Waugh resulted from antiunion bias, or was intended to or did discriminate against him to discourage membership in a labor organization. Waugh's refusal to cross the line was not in obedience to any action by his union. Even Waugh was willing to have the picket line breached, so long as it was done by

others.  No other member of his own union joined him. He held his position under his union's collectively bargained contract, the adjustment processes of which went against him.  It is ironical that respondent has been denied the result of the arbitration by the Board solely because the respondent, by the contract, conceded too much to union security, allowing the union what the Taft-Hartley Act does not permit.  If respondent pursued any wrong course in dealing with Waugh, it evidently was not due to hostility to labor organizations.

The Board, apparently conceding that, if valid, the contract between the union and respondent would establish the latter's defense against the charge of unfair labor practice, held the contract utterly null and void and denied it any effect whatever in this case.  Also, in a proceeding decided June 5, 1951, the Board declared the contract to be illegal in its entirety and set it aside.  In the present case it followed that decision and said, "It would not effectuate the policies of the Act to give effect in this case to a contract which the Board set aside in its entirety in a prior proceeding.  Accordingly, the no-strike clause of that contract can have no impact upon Waugh's refusal to cross the picket line."

The Board's reference to a prior case refers to one decided about a month and a half before the present case. But it was not prior to the conduct out of which this case arises.  The Board did not choose to rely on the doctrine of *res judicata* in the present proceedings, a doctrine whose applicability here is not free from doubt.[4] The ruling that the contract is without effect was re-examined in these proceedings and readopted as an essential part of the decision in this case.

There are two obstacles in the way of the Board's complete disregard of this contract.  The first is that, even

---

[4] See *Wallace Corp.* v. *Labor Board,* 323 U. S. 248.

if inclusion of a forbidden provision is enough to justify the Board in setting it aside as to the future, it does not follow that it can be wholly ignored in judging events that occurred before it was set aside. It is one thing for the Board to say that the parties should not go on under such a contract; it is another to say that no effect whatever may be given to a contract negotiated in good faith by the union and the employer which both believed to be valid and operative, to which both were conforming their conduct, and which no authority had yet held void.

Even where a statute is unconstitutional and hence declared void as of the beginning, this Court has held that its existence before it has been so declared is not to be ignored.

We think the principle is applicable here, which Mr. Chief Justice Hughes stated for a unanimous Court:

> "The courts below have proceeded on the theory that the Act of Congress, having been found to be unconstitutional, was not a law; that it was inoperative, conferring no rights and imposing no duties, and hence affording no basis for the challenged decree. . . . It is quite clear, however, that such broad statements as to the effect of a determination of unconstitutionality must be taken with qualifications. The actual existence of a statute, prior to such a determination, is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration. The effect of the subsequent ruling as to invalidity may have to be considered in various aspects,—with respect to particular relations, individual and corporate, and particular conduct, private and official. Questions of rights claimed to have become vested, of status, of prior determinations deemed to have finality and acted upon ac-

cordingly, of public policy in the light of the nature both of the statute and of its previous application, demand examination. . . ." *Chicot County Drainage District* v. *Baxter State Bank,* 308 U. S. 371, 374.

The second hurdle in the way of the Board's position is that it ignores savings and separability clauses of the contract itself, which we set forth in the margin.[5] We have never known that they are *per se* illegal. We do not, of course, question that there may be cases where a forbidden provision is so basic to the whole scheme of a contract and so interwoven with all its terms that it must stand or fall as an entirety. But the Board here simply held that the provision concerning union security invalidates the whole contract, as the examiner said, "because it does not *expressly* provide that the operation of the union-security provision was to be conditioned upon compliance with the provisions of Section 9 (e) of the Act." [6] (Italics supplied.)

The features to which the Board rightly objects not only may be severed but are separated in the contract. The whole contract shows respect for the law and not defiance of it. The parties, who could not foresee how

---

[5] "To the best knowledge and belief of the parties this contract now contains no provision which is contrary to federal or state law or regulation. Should, however, any provision of this agreement, at any time during its life, be in conflict with federal or state law or regulation then such provision shall continue in effect only to the extent permitted. In event of any provision of this agreement thus being held inoperative, the remaining provisions of the agreement shall, nevertheless, remain in full force and effect."

[6] 29 U. S. C. § 159 (e) (1): "Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 158 (a) (3) of this title, of a petition alleging they desire that such authority be .rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer."

some of the provisions of the statute would be interpreted, proposed to go as far toward union security as they are allowed to go, and this is their right; and they proposed to go no farther, and that is their whole duty. Moreover, there is no showing that these illegal provisions in any way affected Waugh's employment, his discharge, or any conduct of any party that is relevant to this decision.

The total obliteration of this contract is not in obedience to any command of the statute. It is contrary to common-law contract doctrine. It rests upon no decision of this or any other controlling judicial authority. We see no sound public policy served by it. Realistically, if the formal contract be stricken, the enterprise must go on—labor continues to do its work and is worthy of some hire. The relationship must be governed by some contractual terms. There is no reason apparent why terms should be implied by some outside authority to take the place of legal terms collectively bargained. The employment contract should not be taken out of the hands of the parties themselves merely because they have misunderstood the legal limits of their bargain, where the excess may be severed and separately condemned as it can here.

We therefore consider this controversy to require no determination of rights or duties respecting picket lines broader than this contract itself prescribes. It is provided in this agreement that "No strikes, lockouts or other cessation of work or interference therewith shall be ordered or sanctioned by any party hereto during the term hereof except as against a party failing to comply with a decision, award, or order of the Adjustment Board." If this be considered ambiguous in meaning, respondent offered, as evidence of its intent and meaning, to prove that during the negotiations one of the demands made by the union was a clause in the contract

with reference to work stoppages which would have said "No man shall be required to cross a picket line," that this clause was rejected by respondent and the union acquiesced in the rejection and consented to the no-strike clause as above recited. The trial examiner said: "All right. Let the offer of proof appear in the record." From this it is not clear whether it was accepted or rejected. But the arbitrators' interpretation of the contract was in harmony with the offer. They said, "In addition, the contract between the parties does not specifically permit the refusal by the employee to comply with such an order although other contracts in the industry do contain such a provision."

In the section by which the Labor Management Relations Act prescribes certain practices of labor organizations which shall be deemed unfair, there is a proviso that nothing therein "shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this Act . . . ." [7] This clearly enables contracting parties to embody in their contract a provision against requiring an employee to cross a picket line if they so agree. And nothing in the Act prevents their agreeing upon contrary provisions if they consider them appropriate to the particular kind of business involved. An employee's breach of such an agreement may be made grounds for his discharge without violating § 7 of the Act. *Labor Board* v. *Sands Co.*, 306 U. S. 332, 334. In some instances he may not, even with an employer's assent, supplement the collective agreement with individual preferences over others em-

---

[7] 61 Stat. 142, 29 U. S. C. § 158 (b) (4) (D).

ployed under it. *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332.

We hold that the no-strike and arbitration provisions of the contract are not prohibited, nor were they rendered illegal by appearing in the same contract with forbidden provisions in view of the circumstances we have recited. Under the circumstances of this case, it was not an unfair labor practice to discharge Waugh, and the judgment below is

*Affirmed.*

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MINTON concur, dissenting.

Section 7 of the Taft-Hartley Act recognizes a right of employees to work together in "concerted activities" for their mutual aid and protection. One way some union men help others is to refrain from crossing picket lines. Habitual respect for union picket lines has long been the practice of union men. This practice has been a prized asset of the unions. The Taft-Hartley Act was designed to regulate and restrict the type of concerted activities in which employees could engage. But even that Act did not attempt to deprive unions of the advantage of a policy that required union men to respect picket lines. In § 8 (b)(4)(D) of the Act, Congress specifically declared that none of its union-restrictive provisions should be construed to make it unlawful for a man to refuse to cross a picket line thrown up to support a lawful strike. Consequently I agree with the Labor Board that it was an unfair labor practice for this employer to discharge a union employee who refused to cross a picket line. In holding to the contrary I think the Court takes away rights of employees that the Taft-Hartley Act left standing.

I say this despite the fact that the Court's opinion is based upon its interpretation of a collective bargaining

agreement. In the first place, I would accept the Labor Board's holding that the contract did not conform to the requirements of the Taft-Hartley law. It seems to me an unwise precedent for the Court to substitute its judgment about this contract for that of the Board. In the second place, I can find no language in that contract which would justify the discharge of the employee here because he insisted upon respecting a union picket line— a right reserved to each employee by reason of § 8 (b) (4)(D) of the Act. Believing that the Court departs from the Act's policy in holding as it does, I would affirm the Board's order.