The **NEWS UNION OF BALTIMORE**
v.
The **HEARST CORPORATION, NEWS AMERICAN DIVISION.**
Civ. A. No. 16556.

United States District Court
D. Maryland.
Jan. 17, 1968.

Robert L. Weinberg, Jacob B. Davis, Weinberg & Green, Baltimore, Md., for plaintiff.

William A. Agee, Theodore Sherbow, and James J. Doyle, Jr., Baltimore, Md., for defendant.

NORTHROP, District Judge,

This suit by The News Union of Baltimore (the Union) against The Hearst Corporation (Hearst) alleges a violation of the collective-bargaining agreement between the Union, the collective-bargaining representative for Hearst's em-

ployees who are in the editorial and reportorial departments of the newspaper, Baltimore News American, a division of The Hearst Corporation. This court has jurisdiction of the action under the provisions of Section 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185.

The Union alleges that on or about April 20, 1965, continuing through about May 26, 1965, Hearst unlawfully ceased publishing its newspaper and did, in violation of its agreement with the Union, lock out its members.

The collective-bargaining agreement between the parties was entered into on June 12, 1962, and continued in effect until a new agreement was entered into on April 28, 1965, to be effective as of April 1, 1965. This agreement provided in part as follows:

"No strike shall be called or lockout ordered while this agreement, or any extension thereof is in effect, nor shall there be any interruption by strike or lockout in the orderly procedure of negotiation and/or arbitration of a new contract at the expiration of this contract."

By pretrial order dated October 7, 1965, the parties agreed that the issues to be determined are as follows:

(a) Whether Hearst's cessation of operations constituted a breach of the collective-bargaining agreement between the parties as alleged in the complaint;

(b) Whether the Union's members employed by Hearst are entitled to back compensation for the period during which they were unemployed by reason of Hearst's alleged breach of contract; and

(c) The amount of back compensation, if any, due to each of the members of the Union, and the amounts, if any, which shall be deducted from or credited against said back compensation.

On the twenty-second day of June, 1966, this court, upon its own motion, stayed the proceedings in this case pending the determination of those issues in this case which were then before the National Labor Relations Board in a related suit between the same parties. Subsequently Hearst's motion to strike that stay was granted, the National Labor Relations Board having rendered its decision on December 1, 1966. 161 NLRB No. 113, 63 LRRM 1441.

The parties now move for a judgment on the merits, there being no issue as to any of the material facts in the case.

This court makes the following Findings of Fact which have been jointly submitted by the parties and which are substantially in accord with Findings made by the National Labor Relations Board.

### FINDINGS OF FACT

Hearst publishes the Baltimore News American and the A. S. Abell Co. (Abell) publishes the Sunpapers, both of which are daily newspapers of general circulation in the Baltimore metropolitan area. Since the 1920's or earlier, and particularly for the past twenty-five years, Hearst and Abell have jointly bargained with certain unions representing their respective employees and have entered into joint collective-bargaining agreements with these unions. During this time, such contracts have been executed and administered jointly by committees comprised of representatives of both newspapers, and both newspapers have participated in settling disputes arising under the joint contracts. Where a joint contract has been breached by a union, both newspapers have historically regarded the breach as a joint concern and have acted as a multi-employer bargaining unit in connection therewith. The standing policy of both papers for many years has been that if one was forced to cease publication because of a union's breach of a joint contract, the other would also stop publishing. This policy or understanding has been implemented throughout the years, although the papers were never forced to shut down completely to enforce the policy or understanding.

In April of 1965, there existed six different joint collective-bargaining agreements, to which both Hearst and Abell were parties, with six different unions, including Baltimore Typographical Union No. 12 (the Printers) and Truck Drivers and Helpers Union Local Number 355 (the Teamsters). At the same time, Hearst had separate and independent collective-bargaining agreements with five other unions, including the Union, and Abell had a separate and independent agreement with one other union, the Washington Newspaper Guild (the Guild).

The collective-bargaining agreement between Abell and the Guild expired on April 16, 1965. Negotiations for a new contract began on March 1, 1965. From the beginning of the negotiations, the Guild told Abell representatives, who told Hearst, that the Guild would strike if no new agreement was reached before the expiration of the old agreement.

Abell conferred with the six unions with which it and Hearst had joint collective-bargaining agreements to determine what their respective positions would be in the event of a Guild strike and picket line. All of these unions, including the Printers and the Teamsters, assured Abell that their members would be advised to report for work in spite of a guild strike.

In response to requests from Abell, Hearst told Abell that if any union holding a joint contract refused to cross the picket line and, therefore, dishonored the contract, Hearst would cease publication. Prior to the suspension of the publication of the News American, William H. Mills, Business Manager of the News American, advised the president of the Printers Union to the same effect.

On April 15 Hearst sent a notice to all of its employees, including members of the Union, that it intended to continue normal operations in the event of a strike at Abell by the Guild and that any failure of a union to report to work would be considered a breach of the contract.

No agreement between the Guild and Abell was reached, and at noon on April 17, 1965, the Guild went on strike and established picket lines at Abell's plant. Abell was nevertheless able to continue publication and published its newspapers on April 17, 18, and 19. On these three days, employees of Abell who were members of four of the unions which had joint collective-bargaining agreements continued to report for work, but some employees who were members of the Printers' and Teamsters' unions did not. Out of a total of 118 printers scheduled to work the night shift on April 17, only 11 reported for work. Out of 54 teamsters scheduled to work the same shift, only 2 reported. On April 18, no printers or teamsters were scheduled to work the day shift. On the night shift only 8 printers out of 93 scheduled to work reported for work, and no teamsters reported. On the April 19 day shift, 32 out of a scheduled 116 printers reported for work, but left at 11:00 a. m. to attend a chapel meeting of the Printers' Union. None of the 32 returned to work after the chapel meeting.

At the chapel meeting a telegram from the International Headquarters of the Printers Union was read, directing members of the local to cross the Guild picket line and report for work. The telegram was directed to Mr. Miller, President of Local No. 12, and was read to the members of the union by Mr. Daddino, chapel chairman. After the telegram was read, Mr. McGaffin, Vice-President of Local No. 12, stated that he, as an individual, had certain principles which he lived by throughout his life, and that he therefore could not cross a legitimate picket line.

At the conclusion of the meeting "E" cards were issued to printers employed at both Hearst and Abell. An "E" card is an emergency travel card issued to union printers who, for a variety of reasons, are out of work. A travel card is issued to permit the holder to leave the jurisdiction of his local and obtain work in the jurisdiction of another local. Such cards indicate that the printer has severed his relationship with his old local

and intends to establish a permanent connection with a new local. These cards are issued by the International Typographical Union and sent to the local where they are validated, prior to issuance, by local officers.

The "E" card, the emergency travel card, signifies that the holders are on strike and would not cross a picket line in the jurisdiction of their home local, or were locked out. This arrangement is temporary and may be recalled at any time. These cards can be issued only with the permission of the International Union.

At 9:00 p. m. on the evening of April 19, Abell decided it was unable to continue publication, and so notified the bulk of its employees, without distinction between those covered by union contracts and those not. Immediately upon making this major decision, General Manager Bertsch of the Sunpapers notified Hearst of the proposed shutdown. By this time, however, Hearst had already ordered in the employees required for publication of the News American on April 20. Hearst informed Abell that if the Printers and Teamsters continued to violate the joint contracts, Hearst would suspend publication after its editions of April 20, although Hearst could have continued to publish and although none of Hearst's employees had refused to work. Acting pursuant to prearrangement, the next day Hearst advised the great majority of its workmen not to report for work until further notice.

On April 20 Hearst sent a notice to all its employees, including members of the Union, advising that it considered the failure of unions with joint contracts, namely the Printers and the Teamsters, to work at Abell as a breach of contract and that it was consequently suspending publication temporarily. At the same time, Hearst sent to approximately 150–200 employees, which included some members of the Union, an additional communication directing them to continue on their regular employment schedule until such time as they were specifically notified of termination.

With time this number was further reduced until virtually only a skeleton crew remained.

Subsequently, while Mr. McGaffin was acting President of Local No. 12 (Printers), he received a directive from the International Union to withdraw the "E" cards that had been issued to Sunpaper printers. They were withdrawn because there was some discrepancy or error in issuing them. Mr. McGaffin followed instructions and withdrew those "E" cards, at the same time notifying the Secretaries of all other locals to advise Abell's printers that the cards had to be returned by a given date. Once the cards were withdrawn, some printers returned to work while others did not.

During the strike, all unions, having either joint or individual contracts with Hearst, attended a meeting at the News American. Each union was represented by its president, and Hearst was represented by Mr. Collins, its publisher, Mr. Mills, Business Manager, and Mr. Banach, Assistant Business Manager. At the meeting Mr. Collins agreed to resume publications under one of two alternatives: (1) both the Sun and the News American would be published at Hearst's plant, or (2) one paper would be published with a joint Sun and News American masthead. The unions considered this proposal and rejected it, indicating that they desired Hearst to resume publication "without any strings attached as to the Sunpapers."

## CONCLUSIONS

The facts clearly indicate that Hearst suspended publication of its newspaper because of a dispute between it and two unions unconnected with The News Union of Baltimore. Hearst contended at the time of the layoff of the Union's members and before the National Labor Relations Board that these two unions, the Printers and the Teamsters, breached their respective joint collective-bargaining agreements with Hearst and Abell. The bases for this contention were (1) the parties, the two unions mentioned above, on the one hand, and the news-

paper companies on the other hand, intended by their joint collective-bargaining agreements that there would be no strikes during the operation of the agreement merely because of the striking or picketing by other unions; and (2) the refusal of these two unions to cross the picket lines of the striking Guild and to report for work at the Abell plant constituted a violation of the joint contracts between the parties. Consequently, a lockout of these employees of the two offending unions did not constitute unlawful action.

All these contentions were upheld by the National Labor Relations Board, and this court concurs in that decision insofar as it related to the issues herein. The pertinent holdings of the Board are as follows:

"[T]he simultaneous mass action of the printers and chauffeur group * * * was concerted strike activity for which their local unions must be held accountable. * * *

"True, there is no direct evidence of inducement by either union, as such, but union responsibility in this type of situation need not rest upon out and out confession. ' * * * a strike call may be given in a forthright fashion or informally in a manner which is understood by the initiated. H. M. Newman, 85 NLRB 725, enfd. [2 Cir.] 187 F.2d 488. See also U. S. v. International Union, UMWA, [85 U.S.App. D.C. 149] 177 F.2d 29.'

" * * *

"[T]he contracts of both * * * [unions] in effect provided that the men would not engage in or sanction strike [sic] during their terms in this type of situation. I find that when the printers and chauffeur group refused to cross the picket line of the Washington Guild at the Sun Papers, they and their local unions, violated the terms of the multi-employer collective bargaining agreements then in effect.

" * * *

"Whether or not the two-employer agreement be oral or written, whether or not it be new, unprecedented reaction to the immediate events, are questions bearing no relevance to the issue at hand. The applicable rule stands entirely apart from such considerations. 'The Board and the Supreme Court have long held that strikes in violation of the contract are unprotected, and that no violation can be found for interfering with such activity. See American Gilsonite Company, 121 NLRB 1514; N.L.R.B. v. Rockaway News Supply Company, Inc., 345 U.S. 71. * * * [73 S.Ct. 519, 97 L.Ed. 832] Given the admitted facts of association wide bargaining, and the unitwide nature of the problem, we think it reasonable that the Respondents reacted to the series of illegal stoppages on an association-wide basis.' " Publishers' Association of New York City, 139 NLRB 1092.

The laying off of the Union's members was a corollary of the action taken by Hearst against the Printers and Teamsters. The N.L.R.B. held that:

"Even assuming the newspapers could have been delivered for an extended period of time by employees other than the chauffeurs and platform men, certainly they could not be printed at all without the printers. The Board's conclusion in the *New York Mailers* case is particularly apt: 'Because of the integrated nature of the publishing industry, it seems clear that a unitwide lockout of one craft would necessarily result in a suspension of work for all crafts. We are therefore unwilling to engage in the impractical distinction that Respondents could have responded by locking out all members of the offending crafts, but not members of the other crafts.' "

This court concludes that the laying off of the plaintiff's members did not constitute a lockout in violation of the collective-bargaining agreement between the parties. The decision of the court in Local 50, Bakery & Confectionery Workers, International Union of Amer-

ica, AFL v. General Baking Co., et al., 97 F.Supp. 73 (S.D.N.Y.1951) is particularly apt. In that case the court said:

"It is well settled that 'a lockout is an employer's withholding of work from his employees in order to gain a concession *from them*.' [Emphasis supplied.] Labor arbitrators have so understood and applied the term and have frequently stated that the denial of work does not constitute a lockout absent a labor dispute between the parties. A case directly in point here is In re Mrs. Conkling's Bakery [15 Lab.Arb.Rep.168]. In that case the company was a member along with four others of The Wholesale Bakeries of San Diego, an organization which bargained on behalf of the five companies with the Bakery and Confectionery Workers' Union. Negotiations for a new agreement between that Union and the five companies having broken down, the former announced a strike. Although only Winter's Bakery, one of the five, was struck, the other four shut down. Brunner, an employee of Mrs. Conkling's Bakery and a member of the International Union of Operating Engineers, was denied work by Mrs. Conkling's Bakery even though members of his Union were kept at work in the other plants which were not struck.

"The Operating Engineers argued to the Arbitrator that Brunner had been locked out in violation of the following provision of their agreement with the company: '* * * the Employer * * * shall not cause or permit any lockout of the members of the Union * * *.' The Arbitrator held, however, 'that Brunner was not locked out by the Company. There was no controversy between the Company and the Operating Engineers; Brunner simply happened to be indirectly affected by the action taken by the Company against the Bakery Workers' Union. If any lockout did take place it could only have been against members of the Bakery Workers Union.'" at 74.

Accord New York Mailers' Union Number Six, Inter. Typo. Union, AFL-CIO v. N.L.R.B., 327 F.2d 292 (2d Cir. 1964); N.L.R.B. v. Continental Baking Co., 221 F.2d 427 (8th Cir. 1955).

The layoff of the Union's members by Hearst was not a lockout in violation of the collective-bargaining agreement. This conclusion makes unnecessary comment on the issues relating to damages.

Counsel will prepare an appropriate order.