449 F.2d 668
 78 L.R.R.M. (BNA) 2260, 66 Lab.Cas. P 12,049
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SOUTHERN CALIFORNIA PIPE TRADES DISTRICT COUNCIL NO. 16 OF
the UNITED ASSOCIATION, and the United Association of
Journeymen and Apprentices of the Plumbing and Pipefitting
Industry of the United States and Canada, AFL-CIO, Local
Union No. 280, Respondents.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SOUTHERN CALIFORNIA PIPE TRADES DISTRICT COUNCIL NO. 16 OF
the UNITED ASSOCIATION, Respondent.
 Nos. 26570, 26572.
 United States Court of Appeals,
Ninth Circuit.
 Aug. 25, 1971.
 
 Daniel Katz, NLRB (argued), Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Ralph E. Kennedy, Director, NLRB, Los Angeles, Cal., for NLRB.
 Eugene Miller (argued), of Brundage, Neyhart, Miller, Ross & Reich, Los Angeles, Cal., for respondents in 26570.
 Brundage & Hackler, Los Angeles, Cal., for respondent in 26572.
 
 
 1
 Before CHAMBERS and KOELSCH, Circuit Judges, and BYRNE,* District Judge.
 
 WILLIAM M. BYRNE, District Judge:
 
 2
 During its contractual negotiations with Aero Plumbing Company (the Company) the Southern California Pipe Trades District No. 16 of the United Association (the District Council) insisted the collective bargaining agreement include provisos for (1) the posting of a performance bond by the Company, (2) the appointment of the Plumbing-Heating and Piping Employers Council of Southern California, Inc. (the Employers Council) as the Company's agent for the purpose of collective bargaining and adjustment of grievances, (3) the payment of money to an industry promotion fund and (4) the application of the contract to owners and supervisors. Three years later the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada, Local No. 280 (Local 280) was equally intransigent about the said provisions being included in any collective bargaining agreement entered into with the Company. The National Labor Relations Board (the Board) held that the intransigence of the District Council and Local 280 constituted a refusal to bargain, a violation of Section 8(b) (3) of the National Labor Relations Act (the Act).[1] The Board further found that by insisting that the Company designate the Employers Council as its agent for the purposes of collective bargaining and the adjustment of grievances, the District Council and Local 280 violated Section 8(b) (1) (B) of the Act[2] because they denied the Company an opportunity to select its own representative for these purposes. Finally, Local 280 was found to be in violation of Section 8(d)[3] of the Act when it failed to file or to serve appropriate notices prior to striking and picketing the Company.
 
 
 3
 Pursuant to Section 10(e) of the Act,[4] the Board has petitioned for enforcement of its orders directing the District Council and Local 280 to cease and desist from engaging in the unfair labor practices found as well as from applying or enforcing the four provisions which they insisted be a part of the collective bargaining agreements. An adjunct of this aspect of the Order is the Board's approval of the recommendation made by both Trial Examiners that the collective bargaining agreements remain binding "except for those provisions" now in controversy. Also, the Board seeks enforcement of those portions of its order requiring the District Council and Local 280 to notify the Company in writing they will not insist upon the four provisions. Finally, the Board asks the Court to sanction the directive ordering that the Company be reimbursed for its expenses in posting a bond and contributing to an industry promotion fund. Acknowledging the propriety of the Board's findings, the District Council and Local 280 (sometimes referred to as the Respondents) have limited their opposition to enforcement of those portions of the orders dealing with the bargaining agreements sans the four provisions delineated above.
 
 The 1966 Negotiations
 
 4
 Because the so-called "independent agreement"[5] was due to expire on July 1, 1966, a proposed new agreement to be effective from July 1, 1966, to June 30, 1969, was submitted to the Company. On July 12, 1966, Al Aukerman, a partowner and secretary-treasurer of the Company, and Frank Calhoun, who was then President of Interstate Employers Association, Inc., met with Harold Moore, a business agent of Local 280. At this meeting, Calhoun indicated that the Company could not accept the following four provisions of the proposed "independent agreement": (1) the appointment of the Employers Council as the Company's bargaining agent, (2) the requirement that the Company post a performance bond, (3) the payment of certain stipulated sums of money to an industry promotion found and (4) the application of the contract terms to owners and supervisors.
 
 
 5
 In response to the Company's refusal to accede to these proposals, the District Council offered to substitute "in lieu thereof", the following items: (1) nontransferability "of men from the jurisdiction of one union to the jurisdiction of another union," (2) complete elimination of the grievance and arbitration procedure as well as of the no-strike clause, (3) payment of an additional fifty cents per hour above the wages required by the Master Labor Agreement and (4) an additional ten percent of gross wages to be added to the total fringe benefit package.
 
 
 6
 Subsequent to the promulgation of the substituted proposals, representatives of the District Council met with Calhoun on two occasions in an effort "to move the stalled negotiations off dead center." At the meeting of October 4, 1966, Calhoun agreed, in principle, to item one of the substituted proposals proffered by the District Council. As to the other proposals, the District Council maintained the inflexible position it had assumed at the previous meeting. Indeed, at the close of this meeting, Everett Schell, a District Council representative, after being reassured by one of his colleagues that notices had been filed with the federal and state mediation services, declared, "We're free to strike now." When Calhoun expressed the "hope" that they "could resolve (their) differences other ways," Schell retorted, "If you don't like this, you can always sign the standard agreement. * * * We cannot sign a different agreement than we sign with anyone else, and you'll just have to take your best shots."
 
 
 7
 Schell's declaration was more than haughty rhetoric: that afternoon three of the Company's employees were working on a job site within the territorial jurisdiction of Plumbers Local 761 when they were informed by Don Arnold, a business representative of that local, that because the Company had not signed an agreement a picket line would be established the next day. Arnold instructed the men to honor the picket line by not reporting for work the next day. Three days later Schell cryptically rejected Calhoun's request for another meeting by assuring him that "(they would) just be wasting (their) time." Unable to convince the District Council that further negotiations might be helpful, the Company signed the standard agreement which had been originally submitted to it.
 
 The 1969 Negotiations
 
 8
 On April 30, 1969, the District Council notified the Federal Mediation and Conciliation Service and the California State Conciliation Service that it had served written notice on the Employers Council of proposed termination or modification of its separate agreement with the Company which was due to expire on June 30, 1969. The District Council did not so notify the Company.
 
 
 9
 Harry Brannon, Local 280's business manager, sent the Company a "form letter" dated June 25, 1969, stating that because it appeared a negotiated settlement on a new contract would not be reached by the date of expiration of the agreement which was presently in force, the union was making available a thirty day interim contract. Brannon's letter further stated that no work would be allowed on any job in Local 280's territory after July 1, 1969, (the expiration date of the agreement then in force) unless the Company was a "signatory to the agreement."
 
 
 10
 In his reply letter of June 27, 1969, Aukerman observed that it was to the mutual advantage of both sides to continue the bargaining process. Accordingly, he "suggested" that the "existing agreement" be extended "for at least a period of thirty days" during which time "the mandatory collective bargaining procedures as set forth in Section 8(d) of the Labor Management Relation Act" would be adhered to. Aukerman noted that these procedures "prohibit strikes or lockouts until other preliminary steps are taken."
 
 
 11
 Undaunted by the Company's effort to forestall a showdown between labor and management, Brannon contacted Aukerman by telephone on June 30, 1969, and stated that no employee would be permitted to work the following day unless the Company signed the interim agreement. Aukerman replied that he "would probably have to do the work [him] self."
 
 
 12
 The following day, July 1, both sides proved true to the positions enunciated in the previous day's telephone conversation: at about 10:00 A.M. a picket appeared at the Company's job site with a sign bearing the legend "Aero Company Is Working Without a Contract. Local 280." Carpenters, electricians and sheetmetal workers left the job when the picket appeared. Aukerman, his son and his partner continued working for the remainder of the week at which time pickets appeared at the Company's new job site. Under pressure of the union's picketing, the Company signed an agreement which included the same four provisions which were the subjects of the 1966 protracted negotiations.
 
 
 13
 Respondents' opposition to the Board's petition for enforcement is couched in a two-fold attack. First, they charge that approval of the contracts sans the four provisions precludes any possibility of returning the parties to their respective positions prior to the commission of the unfair labor practices. Without a restoration of the status quo ante, the Company will be, so asserts the respondents, an unwitting heir to a collective bargaining windfall: the contracts in their deleted form are "obviously less than respondents bargained for and more than the employer bargained for." In short, the District Council and Local 280 maintained that they should not be "saddled" with contracts which are "not the product of the parties' negotiation."
 
 
 14
 Acceding to respondents' plea that the parties be returned to their pre-contractual positions would constitute a misuse of the doctrine of status quo ante. It is well settled that the doctrine is utilized to prevent the wrongdoer from profiting from his misdeeds. Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); Hinson v. NLRB, 428 F.2d 133 (8th Cir. 1970); Trinity Valley Iron & Steel Co. v. NLRB, 410 F.2d 1161 (5th Cir. 1969). Here it is the perpetrators of the misdeeds who ask that the slate be erased clean and the agreements be renegotiated. Given the true purpose of restoring parties to the status quo, this Court would be prostituting that doctrine if it were to accord credibility to respondents' position. Accordingly, we decline to disturb the agreements as they now stand with the deletions made by the Board. See, NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).
 
 
 15
 Respondents rely on H. K. Porter Co., Inc. v. NLRB, 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970) as authority supportive of their position. In that case the Court held that the Board was without authority to compel the inclusion of a substantive provision in a collective bargaining agreement. Here, the Board deleted from the agreements those provisions which were products of unfair labor practices. Because the Board did not order the Company or the Respondents "to agree to a substantive term of a collective bargaining agreement," we are of the view the two cases are clearly distinguishable. Accord, NLRB v. Central Machine & Tool Co., Inc., 429 F.2d 1127 (10th Cir. 1970).
 
 
 16
 We find respondents' final attempt to block enforcement of the Board's order equally unpersuasive. The agreements in question included separability clauses which provided: "* * * If any single provision, clause, paragraph, sentence, or section of this Agreement is held by any Court, bureau, board or administrative agency to be invalid, illegal, or inoperative, it shall not invalidate the remaining portion or portions of this Agreement." Respondents maintain that the Supreme Court case which sustained the validity of these clauses is not applicable to this controversy because it "determined only that one portion of a labor agreement could be relied upon by an employer in defense of an unfair labor practice charge despite the illegality of another provision of the contract." We do not read this case in so constricted a manner. In NLRB v. Rockaway News Supply Co., Inc., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953), the employer discharged an employee who had refused to cross a picket line established by a union with which he was not affiliated. This employee was the only member of his union not to cross the picket line. The Board's order to reinstate the employee was set aside by the Second Circuit and upon appeal to the Supreme Court the employer argued that the employee's conduct violated terms of a no strike agreement reached with the employee's union. The Board countered by asserting that the entire contract was invalid because the union security clause, which was not involved in the employee's dismissal, did not meet the requirements of Section 9(e) of the Act. The Supreme Court rejected the Board's assertion, holding that the union security clause was severable from the balance of the contract's terms:
 
 
 17
 "We have never known that they (separability clauses) are per se illegal. We do not, of course, question that there may be cases where a forbidden provision is so basic to the whole scheme of a contract and so interwoven with all its terms that it must stand or fall as an entirety. But the Board here simply held that the provision concerning union security invalidates the whole contract * * *
 
 
 18
 "The total obliteration of this contract is not in obedience to any command of the statute. It is contrary to common-law contract doctrine. It rests upon no decision of this or any other controlling judicial authority. We see no sound public policy served by it." (Emphasis supplied). 345 U.S. at 78-79, 73 S.Ct. at 523-524.
 
 
 19
 In the instant case it is clear that the four provisions in question are not "so interwoven with" all of the contracts' terms that the agreements "must stand or fall as an entirety." Accordingly, we find that the broad teaching of Rockaway News Supply applicable to this set of facts and thus deem the separability clauses to have effectively severed the illegal clauses from the otherwise valid contracts. Ebinger Baking Co. v. Bakery & Pastry Drivers & Helpers, Local 802, 194 F.Supp. 617 (E.D.N.Y.1961).
 
 
 20
 For the above stated reasons enforcement of the Board's orders is granted.
 
 
 
 *
 Honorable William M. Byrne, United States District Judge, Central District of California, sitting by designation
 
 
 [1]
 29 U.S.C. Sec. 158(b) (3)
 
 
 [2]
 29 U.S.C. Sec. 158(b) (1) (B)
 
 
 [3]
 29 U.S.C. Sec. 158(d)
 
 
 [4]
 29 U.S.C. Sec. 160(e)
 
 
 [5]
 It is the practice of the District Council to negotiate and enter into a collective bargaining agreement with the Employers Council. Thereafter, the District Council prepares a similar, though not identical contract, called the Independent Agreement which it submits to plumbing contractors who are not members of the Employers Council. As indicated, at the time the events of this controversy were unfolding, such an agreement between the Company and the District Council was in force