ISLAND CREEK COAL COMPANY,
Appellee,

v.

UNITED MINE WORKERS OF AMER-
ICA, DISTRICT 2, UNITED MINE
WORKERS OF AMERICA, and Local
No. 998, United Mine Workers of
America, Appellants.

No. 74–1631.

United States Court of Appeals,
Third Circuit.

Argued Nov. 22, 1974.

Decided Jan. 14, 1975.

As Amended Feb. 5, 1975.

Henry J. Wallace, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Ferdinand F. Bionaz, Bionaz & Raptosh, Johnstown, Pa., for appellee.

Joseph A. Yablonski, Lewis D. Sargentich, Washington, D. C., Lloyd F. Engle, Jr., Melvin P. Stein, Kuhn, Engle, Blair & Stein, Pittsburgh, Pa., for appellants.

Before ADAMS, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

In this appeal from an order granting a preliminary injunction pending arbitration we consider once again the scope of the no strike obligation implied from the settlement of dispute provisions of the National Bituminous Coal Wage Agreement. The plaintiff employer, Island Creek Coal Company, operates Bird No. 2 and No. 3 mines in Somerset County, Pennsylvania, and employs members of Local No. 998, United Mine Workers of America. In April, 1974 a work stoppage commenced at Florence Mining Company No. 2 mine, whose employees belong to Local No. 680 of the United Mine Workers. On April 11, 1974 20 to 25 men not employed by Island Creek, and so far as appears not members of Local 998, picketed Bird No. 2 and No. 3 mines. The Island Creek employees declined to cross the picket line and report for work. Island Creek sought an injunction in the district court pursuant to § 301 of the Labor-Management Relations Act of 1947, 29 U.S.C. § 185 alleging that under the collective bargaining agreement, whether the members of Local 998 were required to report for work across stranger picket lines was an arbitrable dispute under the settlement of disputes procedures of the agreement. After a hearing the district court issued the requested preliminary injunction and Local Union 998 appeals.[1]

The settlement of disputes provisions of the National Bituminous Coal Wage Agreement of 1971 are virtually identical with the settlement of disputes provisions of the 1968 Agreement which was construed by the Supreme Court in Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). The key provisions are Article XVII, § (b):

"Should differences arise between the Mine Workers and the Employer as to the meaning and application of the provisions of this agreement, or should differences arise about matters not specifically mentioned in the agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences at the earliest practicable time." (Appendix at 4a).

and Article XX:

"The United Mine Workers of America and the Employers agree and affirm that they will maintain the integrity of this contract and that all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Disputes' article of this agreement . . . ." (Appendix at 6a)

In Gateway the Supreme Court held that the 1968 Agreement implied a no strike obligation co-terminus with the grievance-arbitration provisions, 414 U.S. at 381–382, 94 S.Ct. 629, and that the language "any local trouble of any kind aris[ing] at the mine" was to be read broadly to encompass even disputes over mine safety. Id. at 376, 94 S.Ct. at 636. If the underlying dispute falls within the scope of the grievance-arbitration clause, then, on the authority of Gateway the order appealed from must be affirmed. The Seventh Circuit, considering the same contract as is before us, and in the same context of a dispute over the employees' duty to cross a stranger picket line, held that injunctive relief was proper. Inland Steel Company v. Local 1545, UMW, 505 F.2d 293 (7th Cir., 1974). Judge Fairchild dissented, referring to the analysis made by Judge Hunter in his dissenting opinion in NAPA Pittsburgh, Inc. v. Automotive Chauffeurs, 502 F.2d 321, 324 (3d Cir.), cert. denied, —— U.S. ——, 95 S.Ct. 625, 42 L.Ed.2d 644 (1974).

Our analysis must begin with the question whether there is a dispute which falls within the grievance-arbitration provisions of the contract. In this respect the present case is distinguisha-

---

1. United Mine Workers of America, and District 2, United Mine Workers of America are also defendant-appellants.

ble both from *Gateway* and from *NAPA Pittsburgh.* In the former the underlying safety dispute was between the employer and its employees and the Supreme Court held that safety disputes were not excepted from the sweeping "any local trouble of any kind" language of the contract. In the latter, although the picket line was not the result of a dispute between the employer and its employees, the contract had an express no strike undertaking and a specific reference to honoring secondary picket lines.[2] In this case there is no express no strike undertaking and there is no contractual reference to honoring picket lines. Thus neither *Gateway* nor *NAPA Pittsburgh* are dispositive of the question of arbitrability of this dispute. As with many legal issues, how we frame the question probably determines its answer.

■ Whatever difficulties there may be concerning the scope of the remedy recognized in Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), there would, we assume, be a high degree of unanimity in support of the proposition that if the contract gives the union and the employees the right to grieve and arbitrate a given dispute that remedy must be pursued in preference to a work stoppage. Thus the initial inquiry should not be whether the employer is entitled to an injunction, but rather, whether the underlying dispute is one which the union and the employees could grieve and arbitrate.

■ In making this initial inquiry, in the context of the employees' refusal to cross a stranger picket line, the start-

ing point is the recognized principle that a union man's honoring of a lawful[3] stranger picket line is protected activity. The right to engage in that protected activity may, however, be bargained away by the collective decision of his union. NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953). In the *Rockaway News* case the collective bargaining agreement contained an express no strike clause but no specific reference to honoring picket lines. An employee truck driver refused to make a pick-up at a plant the employees of which were on strike, and was discharged. His union grieved his discharge through arbitration and the arbitrator decided in favor of the employer. The discharged employee then filed an unfair labor practice charge with the National Labor Relations Board, contending that he was discharged for engaging in protected activity. The Board, recognizing that the right to honor lawful stranger picket lines could be and had been bargained away, held that the contract was void because it contained an unlawful maintenance of membership clause. Thus it sustained the unfair labor practice charge. The Supreme Court reversed, holding that the no strike and arbitration clauses were separable from the maintenance of membership clause, and that the arbitrator's decision was binding. 345 U.S. at 81, 73 S.Ct. 519. *Rockaway News,* is authority for the proposition that the question whether the right to honor a stranger picket line has been bargained away may be an arbitrable question. We ask, then, if Island Creek had discharged its employees who in this

---

**2.** *See* Wilmington Shipping Co. v. Longshoremen's Local 1426, 86 LRRM 2846 (4th Cir., June 19, 1974), cert. denied, —— U.S. ——, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974); Pilot Freight Carriers v. Teamsters, 497 F.2d 311 (4th Cir. 1974). In Monongahela Power Co. v. IBEW, 484 F.2d 1209 (4th Cir. 1973), the court held that an injunction could be issued to enforce a no strike clause in a contract even though it had no provision applicable to honoring a picket line of another union.

**3.** AFL v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1940). While recognition by

the union of an unlawful secondary picket line is normally a violation of § 8(b)(4), 29 U.S.C. § 158(b)(4), in the absence of a contractual undertaking such an unfair labor practice would not give rise to a remedy under § 301, 29 U.S.C. § 185. *Cf.* Carpenter & Joiners Local 213 v. Ritters Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143 (1942) (upholding state law outlawing secondary picketing). Thus for present purposes the question whether the picketing here was lawful stranger picketing or unlawful secondary picketing is irrelevant.

instance refused to cross a stranger-picket line, could the union have grieved their discharge under the settlement of disputes provisions of the instant contract?

■ We grant that the answer is not as clear in this case as in a case where the contract contains an express no strike clause as in *Rockaway News* or an express reference to picket lines, or, as in *NAPA Pittsburgh*, both. Nevertheless we conclude that under the settlement of disputes provisions of this contract the union could have grieved and arbitrated a discharge of its members for refusing to cross a picket line. The contract covers not only all matters dealt with specifically but also "matters not specifically mentioned." Art. XVII, § (b). It provides that "all disputes and claims which are not settled by agreement shall be settled by the machinery provided in the 'Settlement of Disputes' article . . . ." Art. XX. These clauses are broad enough to confer on the arbitrator jurisdiction to resolve disputes over matters which were not specifically resolved in the collective bargaining process, including the matter of the members' right to honor stranger picket lines. This result may superficially seem inconsistent with the philosophy of collective bargaining, since it recognizes a substantial jurisdiction in the grievance-arbitration process to fill in the interstices of the collective bargaining agreement. *See* United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 580, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The apparent inconsistency is only superficial, however, since the settlement of disputes provisions were bargained for and the parties have undertaken to live by them during the term of the contract. The result is consistent, moreover, with the presumption of arbitrability laid down by the Supreme Court.

"An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." Gateway Coal Co. v. United Mine Workers, *supra*, 414 U.S. at 377–378, 94 S.Ct. at 637 (quoting from United Steelworkers of America v. Warrior & Gulf Navigation Co., *supra*, 363 U.S. at 582–583, 80 S.Ct. 1347).

It will undoubtedly be urged that by starting with the question whether the union could grieve a discharge for refusing to cross a picket line we have predicated our analysis upon a different dispute than that before us, since in the discharge case the discharge itself is the dispute. There is, however, no meaningful distinction. In the discharge case the arbitrator would be required to determine whether or not the union has bargained away its members' right to honor stranger picket lines. If he has jurisdiction to make such a determination that jurisdiction is equally available to the employer. To make a distinction which would in effect force the employer to discharge employees in order to bring the settlement of disputes provisions into operation would be counter-productive of the intended purpose of the provisions and of the national policy favoring settlement of industrial disputes by peaceful means.

Since we conclude that the dispute over whether the union has contracted away its members' right to honor stranger picket lines is an arbitrable dispute, it follows from *Gateway* that the injunction appealed from was in this case properly issued.

■ This decision should not, however, be read as generally applicable to contracts where there is neither an express no strike clause nor a reference to the honoring of picket lines. The grievance-arbitration clause in this case is unusually broad; broad enough to permit the arbitrator to decide issues which the parties did not specifically resolve in the bargaining process. Our conclusion that it is broad enough to support the injunctive relief granted by the district court does not mean that in any case where there is a grievance-arbitration clause

employees may automatically be enjoined from honoring picket lines. A narrower grievance-arbitration clause might well produce an opposite result. The no strike obligation is as wide as, but no wider than, the contractual arbitration undertaking of the parties. *See* Parade Publications, Inc. v. Philadelphia Mailers Local 14, 459 F.2d 369 (3d Cir. 1972).

The order appealed from will be affirmed.

ADAMS, Circuit Judge (dissenting):

This Court in *NAPA*, by a 6 to 3 vote, decided that a strike could be enjoined by a federal court when the union members refused to cross a secondary picket line that was established by employees of an associated plant located some distance away. In *NAPA*, the collective bargaining contract in question contained an express no-strike clause and also stated that "It shall not be a violation of the agreement . . . in the event an employee refuses . . . to go through or work behind any primary picket lines . . . at the Employer's place or places of business." There is no express no-strike clause in the collective bargaining agreement present in this case and no direct or indirect reference to secondary picketing. Accordingly, the

majority opinion in this case constitutes an extension of the rule in *NAPA*.

For the reasons set forth in the dissenting opinions in *NAPA*[1] and for the additional reason that an extension is here made to the *NAPA* doctrine that will further constrict the protection established by the Norris-LaGuardia Act, I respectfully dissent.

Moreover, no bench mark has been suggested by which additional extensions can logically be precluded, once the underpinnings of *NAPA* plus those in this case are established.

I am concerned that if the courts continue to interpret the national policy favoring arbitration along the lines set forth by the majority here and in *NAPA*, then by a process of attrition, the salutary rule established after a long and sometimes bitter struggle by the Norris-LaGuardia Act will be imperceptibly chipped away until it has lost a substantial portion of its vitality. The Supreme Court specifically eschewed such an intent. 398 U.S. at 253, 90 S.Ct. 1583.

It was one thing to further the policy favoring arbitration of grievances conventionally submitted to arbitration, and to interpret the no-strike clause so as to permit that to be done.[2] It is quite an-

---

1. For an incisive analysis of the considerations militating against permitting the district court to enjoin the work stoppage in *NAPA*, which is equally applicable in *Island Creek*, see Note, 88 Harv.L.Rev. 463 (1974). The Note points out: (1) that the work stoppage was not designed to force a concession from the employer on an arbitrable issue, as was the strike in Boys Markets v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970); (2) that in *NAPA*, unlike *Boys Markets*, the union was not trying to avoid its obligation to arbitrate and the dispute would ultimately have been resolved by arbitration even without an injunction, so that no "accommodation" was necessary between the policy of the Norris-LaGuardia Act; (3) that in *Boys Markets* the strike was clearly illegal, while in *NAPA* the work stoppage was arguably legal, and instead of "merely enforc[ing]" the obligation that the union freely undertook," as in *Boys Markets*, the *NAPA* injunction created a new obligation which undermined the union's contractual rights; (4) that *NAPA* by permitting an injunction wherever

the work stoppage was arguably illegal would emasculate the Norris-LaGuardia Act by prohibiting injunctions only when the strike was clearly legal, in which case no injunction could be issued in any case; (5) that in *NAPA* since the dispute underlying the work stoppage was between the company and another union, it was not subject to settlement under the arbitration process set out in the NAPA–Local 926 contract—while the arbitrable dispute between *NAPA* and Local 926 was a result, rather than a cause, of the work stoppage; and (6) that under ordinary principles of equity, before enjoining the strike the district court in *NAPA* should have concluded that the employer would probably succeed on the merits of the issue whether the stoppage was legal.

2. *See* Boys Markets, 398 U.S. at 247–248, 90 S.Ct. 1583 (1970). In *Boys Markets*, the dispute arose when the store's frozen foods supervisor and members of his crew, not members of the bargaining unit, began to rearrange merchandise in the frozen food cases.

other thing to make it virtually impossible for union members to maintain their tradition of not crossing picket lines under a rationalization that the union, *sub silentio*, relinquished this valued right in favor of permitting an arbitrator to decide whether an agreement not to honor a picket line should be read into the contract.[3]

398 U.S. at 239, 90 S.Ct. 1583. This is the type of dispute conventionally submitted to arbitration.

3. In the present case, as in *Boys Markets* and *NAPA*, the question involved—whether the union has a right to honor secondary picket lines—is not clearly arbitrable under the collective bargaining agreement. *Contrast* Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 376, 94 S.Ct. 629, 636, 38 L.Ed.2d 583 (1974): "On its face, th[e] contractual language admits of only one interpretation: that the agreement required the union to submit this dispute to arbitration for resolution by an impartial umpire."

The arbitration clauses relevant here are the same generalized ones present in *Gateway Coal*. The character of the issue on which arbitration is sought, however, is different. In *Gateway* the union went on strike because the employer reinstated two supervisors whose presence the union considered a safety hazard. The Court stated, "A collective-bargaining agreement cannot define every minute aspect of the complex and continuing relationship between the parties. Arbitration provides a method for resolving the unforeseen disagreements that inevitably arise." 414 U.S. at 378, 94 S.Ct. at 637. Surely, however, the mineworkers' right here to observe a stranger picket line cannot nonchalantly be described as an "unforeseen" issue.