**DRIVERS, SALESMEN, WAREHOUSE-MEN, MILK PROCESSORS, CANNERY, DAIRY EMPLOYEES AND HELPERS, LOCAL UNION NO. 695, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MADISON EMPLOYERS' COUNCIL et al., Respondents.**

**Nos. 19386, 19429.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 7, 1965.

Decided May 6, 1966.

---

1. "Cf. Grace v. Magruder [80 U.S.App. D.C. 53], 148 F.2d 679." 331 U.S. at 717 n. 12, 67 S.Ct. at 1470.

2. Emphasis added.

Mr. David Leo Uelmen, Milwaukee, Wis., with whom Mr. David Previant, Milwaukee, Wis., was on the brief, for petitioner in No. 19386. Mr. Herbert Thatcher, Washington, D. C., also entered an appearance for petitioner in No. 19386.

Mr. Gary Green, Atty., N.L.R.B., with who Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., were on the brief, for respondent in No. 19386 and petitioner in No. 19429.

Messrs. Louis Sherman and Charles R. Donnenfeld, Washington, D. C., filed a brief on behalf of Building and Construction Trades Department, AFL-CIO, as amicus curiae.

No brief was filed and no appearance was entered for respondent in No. 19429.

Before BAZELON, Chief Judge, and DANAHER and BURGER, Circuit Judges.

BAZELON, Chief Judge:

The Threlfall Construction Company, a general contractor, filed an unfair labor practice charge with the National Labor Relations Board alleging that the Madison Employers Council (representing a number of construction companies) and Local 695 of the Teamsters Union had entered into a contract in violation of section 8(e) of the National Labor Relations Act. The parties waived hearing before a trial examiner and submitted the matter directly to the Board which held that the contract violated section 8(e). The Union's petition for review and the Board's cross-petition for enforcement are now before this court.

Section 8(e) makes it an unfair labor practice to enter into an agreement whereby an employer agrees to engage in secondary activities such as refusing to handle struck or nonunion goods of another employer "or to cease doing business with any other person."[1] An employer, by protecting the refusal of workers to cross a secondary picket line, in effect authorizes a secondary strike and agrees to cease doing business with the second company.[2] The contract clause here is not limited to the crossing of primary picket lines but states generally:

> No employee shall be subject to discipline by the Employer for refusal to cross a picket line or enter upon the premises of another employer if the employees of such other employer are engaged in an authorized strike.

The Board therefore found the clause "unlawful and violative of Section 8(e) insofar as, and to the extent that, it applies to secondary activity."

The Union argues that, although a contract clause protects refusals to cross secondary picket lines, the prohibition of section 8(e) may be avoided if the clause is phrased in terms of the proviso to section 8(b)(4). That proviso, which appears at the conclusion of the section prohibiting secondary boycotts, states:

> *Provided,* That nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter.[3]

---

1. "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void * * *." 73 Stat. 543 (1959), 29 U.S.C. § 158(e) (1964).

2. Truck Drivers Union, etc. v. NLRB, 118 U.S.App.D.C. 149, 153, 334 F.2d 539, 543,

cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964).

3. 73 Stat. 543 (1947), 29 U.S.C. § 158(b) (4) (1964). The proviso refers to strikes "ratified or approved by a representative of such employees whom such employer is required to recognize under this subchapter." The contract refers only to "authorized" strikes. The Board, however, does not challenge the contract on this ground and counsel for the Board, in his brief, notes this as an example of the Board's fairness in interpreting the contract.

In Truck Drivers Union, etc. v. NL RB,[4] we held that a contract clause could protect refusals to cross a "primary" picket line even though the clause was not within the 8(b) (4) proviso. In the present case, the Board relies on *Truck Drivers* as indicating our agreement "that a broad picket line clause is violative of Section 8(e) to the extent that it applies to secondary picket lines." The Union, on the other hand, argues that *Truck Drivers* held that contract clauses within the 8(b) (4) proviso do not violate section 8(e).

*Truck Drivers* contains language to the effect that the law "clearly" allows a contract clause to protect employee refusals to cross picket lines at the premises of another employer "if that picket line meets the conditions expressed in the *proviso* to § 8(b) (4) of the Act."[5] The holding of the case, however, concerns contracts not within the 8(b) (4) proviso. Moreover, the dictum in question is not addressed to the question whether the picket lines referred to in the proviso

can be secondary as well as primary. Nor do the cases ' cited for the dictum deal ostensibly with refusals to cross secondary picket lines.[6]

The proviso to section 8(b) (4) was initially included in the proposed Ball bill in 1947 to exempt from the general prohibition against secondary boycotts "the refusal of employees to cross a legitimate strike picket line." [7] This would seem to include only primary picket lines. The proposed bill allowed damage suits against parties engaging in secondary boycotts. In this context, the "lawfulness" of an employee's refusal to cross a picket line was a meaningful concept.

The proviso of the Ball proposal with its reference to lawfulness was then included in the Taft-Hartley Act, even though secondary boycotts were no longer "unlawful" but instead were unfair labor practices.[8] There is virtually no explanation in the legislative history of the Taft-Hartley Act for the continued use of the proviso,[9] nor is the subsequent history of that act illuminating.[10]

4. 118 U.S.App.D.C. 149, 334 F.2d 539, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964). See generally 113 U.Pa.L.Rev. 151 (1964).

5. *Id.* at 153, 334 F.2d at 543.

6. See Meier & Pohlmann Furn. Co. v. Gibbons, 233 F.2d 296 (8th Cir.), cert. denied, 352 U.S. 879, 77 S.Ct. 101, 1 L.Ed. 2d 80 (1956); NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953).

7. *Hearings on S. 55 and S.J.Res. 22 Before the Senate Committee on Labor and Public Welfare*, 80th Cong., 1st Sess., pt. 1, at 15 (1947). Discussions of the history of the proviso can be found in Tower, *The Puzzling Proviso*, 1 LABOR L.J. 1019, 1021–22 (1950); and Lesnick, *The Gravamen of the Secondary Boycott*, 62 COLUM.L.REV. 1363, 1403–07 (1962).

8. At the same time, 61 Stat. 158 (1947), as amended, 29 U.S.C. § 187(b) (1964), adopted the provision granting a party the right to sue for damages resulting from a secondary boycott.

9. The only reference is the Senate Report's statement that:
"Attached to section 8(b) (4) is a proviso clause, which makes it clear that it shall not be unlawful for any

person to refuse to enter upon the premises of any employer (other than his own), if the employees of that employer are engaged in a strike authorized by a union entitled to exclusive recognition. In other words, refusing to cross a picket line or otherwise refusing to engage in strikebreaking activities would not be deemed an unfair labor practice unless the strike is a 'wildcat' strike by a minority group." S. REP.No. 105, 80th Cong. 1st Sess. 23 (1947).

10. Shortly after enactment, some suggested that section 8(b) (4) outlawed all strikes which in any way tended to coerce neutrals other than those strikes meeting the terms of the proviso. See articles in 1 LABOR L.J. 339, 835, 1019, 1075 (1950). In *Interborough News Co.*, 90 NLRB 2135 (1950), the trial examiner accepted the theory (see *id.* at 2148–49) but the Board did not reach the question (*id.* at 2136) and thereafter never relied on the proviso as a means for interpreting the scope of the secondary boycott provision. Lesnick, *supra* note 7, at 1404.

The Supreme Court in *Rockaway News*, *supra* note 6, at 80, 73 S.Ct. at 525, referred to the proviso and said:
"This clearly enables contracting parties to embody in their contract a provision

By 1959, various loopholes had appeared in section 8(b) (4), including this one: while a union could not use coercion to enforce a hot-cargo agreement whereby a company agreed to engage in some kind of secondary boycott, such agreements were permissible.[11] Section 8(e) of the Landrum-Griffin bill was designed to close that loophole by making it an unfair labor practice to enter into a hot-cargo agreement. It was made clear that workers could still refuse to cross *primary* picket lines without converting those picket lines, as a matter of course, into secondary lines, and unions could continue to contract for the protection of a worker's refusal to cross such lines.[12] The legislative history, however, does not support the view that the 8(b) (4) proviso protects a worker's refusal to cross prohibited, secondary picket lines.

Nor are the arguments for protecting a refusal to cross a secondary line persuasive. It is claimed that allowing a worker to be fired for refusing to cross a secondary picket line does not provide a significantly greater deterrent to the imposition of secondary boycotts since the employer who is being picketed by the secondary lines has recourse under the act against the picketing union.[13] A crucial purpose of the secondary-boycott prohibition, however, is to limit the scope of labor disputes.[14] Encouraging widespread observance of secondary picket lines would frustrate that purpose.

It is also said to be onerous to require a worker to determine whether a picket line is primary or secondary before he can exercise his right to refuse to cross a picket line when even lawyers and courts have great difficulty in making such a determination. A worker, the argument goes, must either cross all picket lines or gamble that those he refuses to cross will subsequently be held to be primary. However, recent decisions promise clarification.[15] Moreover, employees and employers will generally be advised by counsel and will not have to rely upon their own judgment. Furthermore, it is perhaps no less difficult to decide when a strike has been "ratified or approved" and whether the union involved is one whom the "employer is required to recognize under this subchapter," both necessary preconditions to reliance upon the 8(b) (4) proviso.

We conclude that the legislative history and the general purpose of the 1959 amendments to the Taft-Hartley Act support the Board's view that the proviso to section 8(b) (4) does not allow unions and companies to agree to protect a worker's refusal to cross a prohibited picket line.

---

against requiring an employee to cross a picket line if they so agree. And nothing in the Act prevents their agreeing upon contrary provisions if they consider them appropriate to the particular kind of business involved." Otherwise, the proviso was generally ignored.

11. Local 1976, United Bhd. of Carpenters, etc. v. NLRB, 357 U.S. 93, 106–107, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

12. See discussion of the legislative history on this point in Truck Drivers Union, etc. v. NLRB, 118 U.S.App.D.C. 149, 153–155, 334 F.2d 539, 543–545, cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964); also see H.R. 8342, 86th Cong., 1st Sess. § 705(a) (2) (1959) in I LEGISLATIVE HISTORY OF THE LABOR-MANAGEMENT REPORTING AND DISCLO-SURE ACT OF 1959, pp. 755–56, hereinafter cited as "LEG. HIST."; H.REP.No. 741, 86th Cong., 1st Sess. 22 (1959), I LEG. HIST. 780, U.S.Code Cong. and Admin.News 1959, p. 2424.

13. An employer can bring an unfair labor practice charge under Section 8(b) (4) and can sue for damages. See note 8 *supra.*

14. Local 1976, United Bhd. of Carpenters, etc. v. NLRB, 357 U.S. 93, 100, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958).

15. See, e. g., United Steelworkers of America v. NLRB, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964); Local 761, International Union of Elec., Radio & Mach. Workers, etc. v. NLRB, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961); Local 1976, United Bhd. of Carpenters, etc. v. NLRB, *supra* note 14.

The Union also contends that, even if the contract clause here is not exempted from the coverage of section 8(e) by the 8(b) (4) proviso, the clause is validated by the so-called "on-site" construction work proviso to section 8(e).[16] This proviso states:

> Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction * * *.

The Employers' Council here is composed of members engaged "in the business of the manufacture, sale, and distribution of ready-mix concrete and other building material and supplies." The Union alleges that the pouring of concrete, formerly mixed and poured by hand on construction sites, still involves sufficient activity at the site when delivered and poured by ready-mix trucks to bring the contract within the terms of the proviso. The Board rejected this contention because it

> has heretofore held that the mixing and pouring of ready-mix concrete at a construction site is not construction work but merely the delivery of a material or product.

The proviso itself casts no light on the meaning of "work to be done at the site of the construction." The legislative history, however, makes it relatively clear that those delivering (and presumably unloading) supplies are not included within the proviso.[17]

The question, then, is whether ready-mix drivers are more like delivery men or workers on the construction site. The Union claims that the proviso excludes only suppliers who furnish "either finished goods which will not be altered when they reach the job site, or raw materials which are not to be combined or changed by their supplier." Nothing in the legislative history directly supports this general claim, nor is the history helpful in classifying ready-mix drivers.

"[T]he Board's interpretation of the Act and the Board's application of it in doubtful situations are entitled to weight."[18] The Board has previously held that ready-mix drivers do not engage in on-site construction work,[19] and the Second Circuit has agreed that the mixing of concrete at the site is "merely the final act of the delivery process."[20]

The Union has not shown the Board's interpretation of the Act to be unreasonable. The Union refers to the "work" done at the site by the ready-mix driver,[21] but any driver unloading his truck will necessarily do some work at the site. The Union also points out that due to the nature of ready-mix, once it is

16. The Union also claims that we should not strike down the contract clause until it is actually applied unfairly. This court in Truck Drivers Union, supra note 12, 118 U.S.App.D.C. at 152, 334 F.2d at 542, answered a similar contention by agreeing with the Board that "the implementation of a contract * * * [is] not relevant to its validity under § 8(e) * * *."

17. See H.R.Conf.Rep.No. 1147, 86th Cong., 1st Sess. 39 (1959), I Leg. Hist. 943, U.S.Code Cong. and Admin.News 1959, p. 2503; II Leg. Hist. 1433 (remarks of Senator Kennedy). See also id. at 1858 (post-passage remarks of Senator Goldwater).

18. NLRB v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), quoted in Truck Drivers and Helpers Local Union, etc. v. NLRB, 101 U.S.App.D.C. 420, 422, 249 F.2d 512, 514 (1957), cert. denied, 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533 (1958).

19. See International Bhd. of Teamsters, 145 N.L.R.B. 484, 490–491 (1963); Teamsters Local Union 559, 138 N.L.R.B. 532, 535 (1962).

20. NLRB v. International Bhd. of Teamsters, 342 F.2d 18, 22 (2 Cir. 1965).

21. The concrete often is mixed by the driver after his arrival at the construction site. Proper mixing involves the manipulation of one or two levers and apparently takes some skill and experience. The more difficult task is regulating by means of two or three levers the discharge of the concrete.

delivered and unloaded, further work by someone on the site is necessary before the concrete hardens in a useless form. Suppliers, on the other hand, can leave their materials without requiring anyone on the site to do anything with them immediately. The importance of this distinction is that the purpose of the section 8(e) proviso was to alleviate the frictions that may arise when union men work continuously alongside nonunion men on the same construction site.[22] There would seem to be little more danger of friction, however, when a ready-mix man unloads than when another truck driver unloads his steel, for example. Generally workers on the job will assist in unloading the steel and begin to use it, or they will at least be working in the vicinity.

On the other hand, the possibility of some friction is increased during a strike since the immediate finishing of the concrete has to be done by strikebreakers or supervisors. Nothing in the legislative history, however, indicates that the purpose of the 8(a) proviso was also to avoid friction resulting from work on struck premises, nor are the possibilities of such friction unique to the construction industry. Furthermore, even were this issue less clear, it alone would not be sufficient to make the Board's application of the Act here unreasonable when viewed against the basic thrust of section 8(e): to prohibit all hot-cargo agreements.[23]

22. See Essex County & Vic. Dist. Council of Carpenters, etc. v. NLRB, 332 F.2d 636, 640 (3rd. Cir. 1964); NLRB v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951) (Douglas, J. dissenting); Comment, *Hot Cargo Agreements Under The National Labor Relations Act: An Analysis of Section 8(e)*, 38 N.Y.U.L. Rev. 97, 111 (1963); Comment 45 Cornell L.Q. 724, 753 (1960).

23. Essex County & Vic. Dist. Council of Carpenters, etc. v. NLRB, supra note 22, 332 F.2d at 640; Los Angeles Mailers Union No. 9, etc. v. NLRB, 114 U.S.App. D.C. 72, 74, 311 F.2d 121, 123 (1962); Aaron, *The Labor-Management Reporting and Disclosure Act of 1959*, 73 HARV.L. Rev. 1086, 1118 (1960); Note, *Hot Cargo Clauses: The Scope of Section 8(e)*, 71 YALE L.J. 158, 163 (1961).

The Board's interpretation of the section 8(e) proviso is therefore also affirmed and its order in this case will be enforced.

So ordered.

The Davis-Bacon Act, 46 Stat. 1494 (1931), 40 U.S.C. § 276a (1964), a minimum-wage, maximum-hours law applicable to workers under federal government contract who are "employed directly upon the site of the work," has been applied to ready-mix drivers. Op.Sol.Labor, No. DB–1, April 3, 1961, CCH LABOR LAW REPORTER, 2 WAGES HOURS, ¶ 26,901.-352. But this is a remedial act for the benefit of construction workers, United States v. Binghamton Construction Co., 347 U.S. 171, 176–178, 74 S.Ct. 438, 98 L. Ed. 594 (1954), and is therefore liberally construed to effectuate its beneficent purpose. The proviso to § 8(e), on the other hand, as an exception to the Landrum-Griffin Act's overriding aim to prohibit secondary boycotts, is strictly construed.