**In the Matter of the Application of BULLARD CONTRACTING CORPORATION, Petitioner-Respondent, For a Judgment Permanently Staying the Arbitration Commenced by Laborers' International Union of North America, Local Union No. 91, Respondent-Petitioner.**

No. Civ-78-529.

United States District Court,
W. D. New York.

Jan. 26, 1979.

McGrath, Meyer, Lieberman & Lipp, P. C., Buffalo, N. Y. (Robert N. Convissar, Buffalo, N. Y., of counsel), for petitioner Bullard Contracting Corp.

Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y. (Richard Lipsitz, and Eugene W. Salisbury, Buffalo, N. Y., of counsel), for respondent-petitioner.

CURTIN, Chief Judge.

Bullard Contracting Corporation ["Bullard"], upon being advised of the pending arbitration of two grievances filed by Laborers' International Union of North America, Local Union No. 91 ["Local 91"], instituted a proceeding in New York State Supreme Court, Erie County, for a stay of that arbitration. Bullard's petition alleged that the subcontracting clause which Local 91 sought to enforce in the arbitration proceeding was illegal and, thus, unenforceable because it violated the Sherman Antitrust Act. The action was removed to this court by Local 91 and Local 91 subsequently has made a motion for an order denying Bullard's application for a stay of arbitration.

The facts in this case are straightforward. Bullard is a general contractor that specializes in the construction of sanitary sewers and water lines. In the operation of its business, Bullard annually purchases and receives goods valued in excess of $50,000 from suppliers located in states other than New York. Prior to June 1, 1978, it had been a signatory to a collective bargaining agreement between Local 91 and the Building Industry Employers' Association of Niagara County, although not a member of that association. When that agreement expired, Bullard entered into an interim agreement with Local 91 on June 1, 1978 in which Bullard agreed to become a signatory to the collective bargaining agreement ["Agreement"] entered into between Local 91 and the Council of Utility Contractors, Inc.

This Agreement contains comprehensive provisions governing wages, hours, terms and conditions of employment, fringe benefits, and procedures for adjusting grievances. Article VI of the Agreement, Conditions of Employment, contains a subcontracting provision requiring all signatories of the Agreement to obtain compliance with all the terms of the Agreement from any subcontractors to whom it subcontracts.[1] One such term is the union security clause of Article VI which requires contractors to recognize the union as sole bargaining agent and requires membership in the union by employees after seven days as a condition of employment.[2] On August 14, 1978, Local 91 served Bullard with two notices claiming that Bullard had violated the subcontracting clause of the Agreement on two separate occasions.

---

1. Article VI of the Agreement provides:

    Section 7. (a) SUBCONTRACTING. This Agreement shall apply in its entirety to all subcontractors.

    (b) In its contractual relationship with a subcontractor each contractor bound by this Agreement shall, prior to or at the time of the execution of the subcontract, require such subcontractor to be bound to and abide by all the terms and conditions of this Agreement in performing work of the kind covered by this Agreement, to be done at the site of the construction, and the subcontractor by acceptance, prior to or at the time of the execution of the subcontract, shall agree to abide by all the terms and conditions thereof and be subject to the Grievance Procedure and/or any other disciplinary provisions contained in this Agreement.

2. The union security clause is contained in § 3 of Article VI. It provides:

    Section 3. (a) UNION SECURITY. The Contractor recognizes the Union as the sole collective bargaining agent for all its Employees employed on work covered by the scope of this Agreement.

    \* \* \* \* \* \*

    (c) All present employees who are not members of the Union, and all employees who are hired hereafter, shall become and remain members in good standing in the Union as a condition of their employment after the seventh (7th) day following the beginning of their employment or the effective date of this contract, whichever is the later, as authorized in Section 8(a)(3) of the Labor Management Relations Act of 1947, as amended.

The first of these incidents concerned a contract Bullard made with Milhurst Construction, Inc. on or about July 6, 1978, for construction work on a sanitary sewer project on Rapids Road, Lockport, for the Town of Lockport Sewer District No. 3. Milhurst is a non-union contractor. The second alleged violation of the Agreement occurred when Bullard contracted with Ronald Coulsen to perform certain sewer excavation work on Ernest Road in the City of Lockport. Ronald Coulsen is non-union and employs only himself and his son. At no time were employees of Milhurst or Coulsen members of Local 91. Local 91 filed grievances with respect to both of these subcontracts.[3]

Bullard argues that enforcement of the Agreement through arbitration should be enjoined because it violates the antitrust laws.[4] In its argument that the subcontracting clause violates the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, Bullard relies heavily on *Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Local 91 contends that *Connell* is distinguishable and does not preclude enforcement of the subcontracting clause in question here.

The facts of *Connell* are simple. The union in that case picketed a number of general contractors in the Dallas area with the sole purpose of obtaining from such contractors an agreement that, in making subcontracts for the performance of mechanical work, each contractor would deal only with firms that were parties to Local 100's current collective bargaining agreement with mechanical subcontractors. Local 100 had no contract with Connell, one of the general contractors which it picketed, nor did it wish to represent Connell's employees. The purpose was to assist Local 100 in its efforts to organize the mechanical subcontractors in the Dallas area. Connell eventually gave in to the picketing and signed a subcontracting agreement with Local 100. Connell then sought a judicial declaration that that agreement was an illegal restraint on competition in violation of the Sherman Act. Local 100 contended that the agreement it obtained from Connell was exempt from antitrust sanctions and also allowed by the construction-industry proviso to § 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e).

**3.** In addition to bringing this action to secure a stay of arbitration, Bullard also filed a charge with the National Labor Relations Board alleging that Local 91 and the Council of Utility Contractors have engaged in and are engaging in an unfair labor practice within the meaning of § 8(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(e) [the "Act"]. As a consequence of that, the Regional Director of the National Labor Relations Board petitioned under § 10(*l*) of the Act, 29 U.S.C. § 160(*l*), for an order to show cause why the enforcement of the subcontracting provision of the Agreement entered into by Local 91 and the Council of Utility Contractors should not be enjoined. *Seeler v. Laborers International Union of North America, Local Union No. 91, AFL–CIO, et al.*, Civ. No. 78–688 (W.D.N.Y.). Judge John T. Elfvin issued such an order and the case subsequently was assigned to me as a related case. Although the return date was scheduled originally as November 13, 1978, the parties entered into an agreement submitted to the court in which a number of cases pending before the National Labor Relations Board ["NLRB"] with similar issues and subcontracting clauses were noted and in which Local 91 agreed not to proceed with arbitration or pending grievances or otherwise enforce the provisions of Article

VI, § 7, of the collective bargaining agreement until those cases are decided.

On November 20, 1978, Local 91 informed the court by letter that because the NLRB had announced its interpretation of the legality of subcontracting clauses similar to that involved in this case (*see Carpenters Local No. 94 v. Woelke & Romero Framing, Inc.*, 239 NLRB No. 40, November 13, 1978), it would take the position that the agreement delaying enforcement of the subcontracting clause was terminated. The latest development in the *Seeler* case occurred on January 4, 1979, when the office of the Regional Director of the NLRB informed the court that it intended to withdraw its 10(*l*) petition.

**4.** Although Bullard also filed an unfair labor practice charge with the NLRB (*see* n.3, *supra*), both Bullard and Local 91 agree that this court should decide whether the Agreement violates the antitrust laws rather than waiting for a decision by the NLRB. The best course in this case is to proceed. *See Orange Belt District Council of Painters No. 48 v. Maloney Specialties, Inc., et al.*, No. CV 77–3033–WP6 (C.D.Cal. June 1, 1978) (unreported decision).

The Supreme Court held that the agreement

which is outside the context of a collective-bargaining relationship and not restricted to a particular jobsite, but which nonetheless obligates Connell to subcontract work only to firms that have a contract with Local 100, may be the basis of a federal antitrust suit because it has a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions.

*Connell, supra,* 421 U.S. at 635, 95 S.Ct. at 1841. The construction-industry proviso of § 8(e), in the absence of a collective-bargaining relationship, did not immunize the subcontracting agreement from the reach of the Sherman Act.

■ Local 91 argues that the presence of a collective-bargaining relationship between it and Bullard distinguishes this case from *Connell.* This court agrees.

Bullard's petition points out with some precision the tension between the federal antitrust policy of promoting competition and the federal labor policy of encouraging collective bargaining between employees and employer. The combined effect of the subcontracting clause and the union security clause in the Agreement does require Bullard to subcontract only with subcontractors who agree to recognize Local 91 and whose employees join the union within seven days. The federal labor policy expressed in the construction-industry proviso of § 8(e) saves this provision from the general prohibition against secondary union activity.[5] In enacting this proviso Congress recognized the legitimate interest of a union in negotiating a subcontracting provision which would permit an employer to subcontract work to be performed at a construction site only to subcontractors who are signatory to contracts either with a particular union or with an appropriate union. Such a provision was recognized as a means of avoiding conflicts between union and non-union workers at a construction site and as a means of preserving work for union members. *See Connell, supra,* 421 U.S. at 629–30, 95 S.Ct. 1830; *Orange Belt District Council of Painters No. 48 v. Maloney Specialties, Inc., et al.,* No. CV 77–3033–WP6 (C.D.Cal. June 1, 1978) (unreported decision); *Carpenters Local No. 944 v. Woelke & Romero Framing, Inc.,* 239 NLRB No. 40 (November 13, 1978). *See also Note, The Supreme Court, 1974 Term,* 89 *Harv.L.Rev.* 47, 234, 243–45 (1975).

The holding in *Connell* that the union's activity in that case could constitute an antitrust violation does not preclude the applicability of the § 8(e) proviso to the facts of this case. In examining the scope of the § 8(e) proviso as it relates to the federal antitrust policy, the Supreme Court held in *Connell* that its authorization

extends only to agreements in the context of collective-bargaining relationships

---

5. Section 8(e) provides:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible [sic] and void: *Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or* repair *of a building, structure, or other work*: *Provided further,* That for the purposes of this subsection and subsection (b)[(4)(B)] of this section the terms "any employer," "any person engaged in commerce or an industry affecting commerce," and "any person" when used in relation to the terms "any other producer, processor, or manufacturer," "any other employer," or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception. 29 U.S.C. § 158(e) (emphasis supplied).

and, in light of congressional references to the *Denver Building Trades*, [341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284] problem, possibly to common-situs relationships on particular jobsites as well.

421 U.S., at 633, 95 S.Ct. at 1840. In this case, Bullard was a signatory to the Agreement between Local 91 and the Council of Utility Contractors. The presence of this collective-bargaining relationship between the parties is the controlling distinction between this case and *Connell*. Since the subcontracting and union security clauses were negotiated in the context of that relationship they do not fall under the proscription of *Connell* and are exempt from the sanctions of the antitrust laws. *See Orange Belt, supra.*

█ Bullard argues that its collective-bargaining relationship with Local 91 is not determinative and argues that the overall effect of the subcontracting and the union security clauses is a direct restraint on the market in that non-union subcontractors like Milhurst are precluded from the subcontracting market. It argues further that protection of the § 8(e) proviso is not available here because no Bullard employee was present at the jobsites at which the subcontractors were working.

The court is not persuaded by these arguments. The whole thrust of the *Connell* opinion was directed at the impact caused by the absence of the collective-bargaining relationship. The subcontracting provision with a "stranger" contractor like Connell, and its effect of securing top-down organizing, were seen to be an organizational weapon outside the federal labor policy. The Supreme Court also scrutinized the ef-

fect on competition caused by the "most-favored nation" clause of the multi-employer agreement that the union had with the Dallas mechanical subcontractors and the territorial effect of the agreement obtained from Connell. The Court believed that the effect would be to eliminate competition even as to subjects unrelated to wages, hours, and working conditions. Without consideration of the possible effect of the § 8(e) proviso, the Supreme Court held that there could be no immunity from the antitrust laws where an agreement between a union and a non-labor party had such an effect.[6] The Supreme Court noted, however, that such restraints on a market may be entitled to an antitrust exemption if included in a lawful collective-bargaining agreement. *Connell, supra,* 421 U.S. at 625–26, 95 S.Ct. 1830. *See California Dump Truck Owners Association, Inc. v. Associated General Contractors of America, San Diego Chapter,* 562 F.2d 607 (9th Cir. 1977); *Signatory Negotiating Committee v. Local 9, International Union of Operating Engineers, AFL–CIO,* 437 F.Supp. 1384 (D.Colo. 1978).

The analysis in *Connell*, therefore, with respect to both the application of the antitrust laws and the application of the construction-industry proviso of § 8(e), focused on the absence of a collective-bargaining agreement. The court recognizes that the application of the union security clause of the Agreement after seven days could cause some restraint on competition and have some incidental organizational effects. However, the union security clause is limited only to employees of the subcontractor working on the site and the presence of a collective-bargaining agreement in this case requires that Bullard's argument fail.

---

**6.** A review of the authorities suggests that there is some question whether antitrust liability such as that imposed in *Connell* was intended for activity which is within the recognized (organizational) purposes of labor unions. *See* discussion of legislative history in *Amalgamated Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 707, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), and *Connell, supra,* at 638–55 (J. Stewart, dissenting opinion). Certainly, where a labor union combines with a business firm for purposes which are destructive of competition, without any corresponding benefit for unions or the

collective bargaining process, antitrust principles have applied. *Compare Jewel Tea, supra,* with *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), both cases which were decided after the Labor Management Relations Act of 1947, 29 U.S.C. § 141 *et seq.,* and the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.,* were enacted. Where alleged restrictions on the business market result directly from the collective-bargaining process, however, it is at least unclear that antitrust principles were meant to apply.

The common-situs objection of Bullard is also unpersuasive. The construction-industry proviso of § 8(e) is limited, of course, to work to be done at the jobsite. Bullard asserts that no Bullard employee was at the locations where the two non-union subcontractors, Milhurst and Coulsen, were working. It reasons, therefore, that the subcontracting clause is not valid under *Connell* and § 8(e) because it is not limited to a particular jobsite. Bullard's assertion is not determinative.

In this case the terms of the subcontracting clause of the Agreement expressly apply only to work to be done at the site of construction. On its face, the Agreement is within the proviso of § 8(e). Moreover, one district court recently has rejected the contention of Bullard that the employees of the subcontractor must be on the construction site at the same time as the employees of the contractor for the § 8(e) proviso to apply. *Orange Belt, supra,* at 3. The proviso could be avoided easily by an employer "by simply making certain that none of his own employees were on the same job site as the subcontractor's non-union people." *Id.* This is a sound analysis for one legislative and judicial concern behind the § 8(e) proviso, that of preventing conflict on the jobsite, would seem equally strong whether the union and non-union employees were working side by side or, rather, the general contractor attempted to assign the work in such a way as to avoid that.

One should note as well that the definition of jobsite in a case such as this one where the general contractor's entire job may be spread over a considerable geographical distance, is unclear. Where the provision in question is expressly limited to work to be done at the site of construction, I see no reason why this objection of Bullard should prevent arbitration of Local 91's grievances from continuing. In fact, whether the work subcontracted by Bullard was work to be done at the jobsite would seem to be a question for arbitration.

For all of the foregoing reasons, the court denies Bullard's application for a stay of arbitration.

So ordered.