PACIFIC NORTHWEST CHAPTER OF the ASSOCIATED BUILDERS & CONTRACTORS, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

OREGON–COLUMBIA CHAPTER, the ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL NO. 701, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

WOELKE & ROMERO FRAMING, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Carpenters Local No. 944, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, and Carpenters Local No. 235, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Intervenors.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CARPENTERS LOCAL NO. 944, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL–CIO, and Carpenters Local No. 235, United Brotherhood of Carpenters and Joiners of America, AFL–CIO, Respondents.

Nos. 78–3469, 78–3487, 78–3619, 78–3468 and 79–7011.

United States Court of Appeals,

Ninth Circuit.

Dec. 26, 1979.

Thomas M. Triplett, Portland, Or., Sara Green, Washington, D. C., argued, for petitioner; Southern, Spaulding, Kinsey, Williamson & Schwabe, Lewis K. Scott, David H. Wilson, Jr., Dezendorf, Spears, Lubersky, Portland, Or., Daniel R. Levinson, Washington, D. C., Vincent J. Apruzzese, Springfield, N. J., Robert J. Hickey, Peter G. Kilgore, Kirlin, Campbell & Keating, Washington, D. C., Jerome B. Buckley, Jr., Richard R. Carney, Portland, Or., John W. Prager, Jr., Musick, Peeler & Garrett, Los Angeles, Cal., Kenneth C. McGuiness,

McGuiness & Williams, Washington, D. C., on brief.

John Elligers, N.L.R.B., Washington, D. C., Lawrence J. Cohen, Washington, D. C., John W. Prager, Jr., Los Angeles, Cal., argued, for respondent; Elliott Moore, N.L.R.B., Washington, D. C., Daniel R. Levinson, Robert J. Hickey, Peter G. Kilgore, Washington, D. C., Lawrence Rosenzweig, Los Angeles, Cal., on brief.

Abe F. Levy, Los Angeles, Cal., argued, for intervenor.

Julius Reich, Reich, Adell, Crost & Perry, Los Angeles, Cal., amicus curiae.

Before SNEED and KENNEDY, Circuit Judges, and EAST *, District Judge.

SNEED, Circuit Judge:

Construction contractors challenge in these cases the legality of a provision in a collective bargaining agreement which prohibits a signatory contractor from assigning work to subcontractors unless the subcontractors have a collective bargaining agreement with the signatory union. The National Labor Relations Board has ruled that such a provision does not violate the prohibition in the National Labor Relations Act (the Act) against "hot cargo" agreements.[1]

In deciding these cases we must determine the scope of the Supreme Court's holding in *Connell Construction Co. v. Plumbers Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). We hold that under *Connell* the clauses before us are not lawful under section 8(e) of the Act, 29 U.S.C. § 158(e) (1976), and are not within the construction industry proviso of section 8(e).

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. A hot cargo provision, so named because of the prevalence at one time of such provisions in

Teamsters Union contracts, is an agreement between a union and an employer by which the employer promises not to use the materials— or, as in this case, the services—of nonunion employers.

Our jurisdiction rests on 29 U.S.C. § 160(e) and (f) (1976).

## I.

### FACTUAL BACKGROUND

Two decisions of the Board are before us for review. The first considered the legality of a collective bargaining agreement between the Oregon-Columbia Chapter of the Associated General Contractors of America, Inc. (AGC), which is an association of approximately 200 employers engaged in construction in Oregon and southwest Washington, and the International Union of Operating Engineers, Local 701 (Engineers). The agreement, effective from June 1, 1975 through May 31, 1980, contains a provision precluding AGC employers from assigning jobsite work covered by the agreement to any subcontractor which does not have a current labor agreement with Engineers.[2] Another provision makes violations of the agreement subject to a grievance and arbitration procedure, and the results of arbitration are enforceable by "such action as they [the parties] deem necessary . ." This article would thus permit enforcement of the agreement, including the subcontractor clause, through strikes or picketing.

Following a charge filed by another association of construction employers, the General Counsel of the NLRB issued a complaint alleging that the agreement's subcon-

tractor clause and enforcement provision violate section 8(e) of the Act.[3] The case was heard by the Board upon stipulated facts and it held that, while the subcontractor clause fell within the general proscription of section 8(e), the clause was protected by the section's construction industry proviso. However, the Board invalidated the self-help enforcement provision insofar as it authorized economic sanctions in support of the subcontractor clause. All parties petitioned this court for review and modification of the Board's order. The Board, of course, seeks enforcement of its order.

The second decision of the Board which we review considered challenges to a proposed collective bargaining agreement which locals of the United Brotherhood of Carpenters and Joiners of America, AFL–CIO (Carpenters), sought to establish with Woelke & Romero Framing, Inc. (Woelke), a framing subcontractor who has performed work for various construction contractors in southern California. Between 1974 and 1977, Woelke was a party to a collective bargaining agreement with Carpenters. This agreement was due to expire on June 15, 1977, and, beginning on June 3, 1977, Woelke commenced negotiations with Carpenters concerning a successor arrangement. Two provisions of the proposed new agreement generated contention. One of these provisions forbade Woelke to subcontract jobsite work except with firms having a current labor agreement with Carpen-

---

**2.** The subcontractor clause provides in pertinent part as follows:

> Employers shall not contract any work covered by this Agreement to be done at the site of the construction, alteration, painting, or repair of a building, structure or other work to any person, firm or company who does not have an existing labor agreement with the Union covering such work.

**3.** Section 8(e) provides in pertinent part as follows:

> It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from

handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work . . . .

29 U.S.C. § 158(e) (1976).

ters.[4] The second provision included foremen within the unit of employees whom Carpenters would represent. According to the parties' stipulations, foremen function as supervisors and also as Woelke's selected representatives for purposes of collective bargaining or the adjustment of grievances. Impasse over these provisions led to the termination of negotiations on August 4, 1977. Thereafter, Carpenters picketed Woelke at four jobsites. As a consequence of this picketing, employees of the subcontractors of general contractors at two of the jobsites refused to work.

Upon charges filed by Woelke, the General Counsel of the NLRB issued a complaint against Carpenters. After hearing the case upon stipulated facts, the Board decided that the proposed subcontractor clause was protected by the construction industry proviso. It follows, the Board held, that picketing by Carpenters did not violate the prohibition in section 8(b)(4)(i) and (ii)(A) of the Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(A) (1976).[5] Before reaching this conclusion the Board held that but for the construction

industry proviso the proposed subcontractor clauses would violate section 8(e).

In addition, the Board concluded that bargaining to impasse and picketing intended to compel the unionization of Woelke foremen constituted a violation of section 8(b)(1)(B) of the Act, 29 U.S.C. § 158(b)(1)(B) (1976),[6] and ordered Carpenters to desist from this practice.

The Board requests enforcement of this order. Woelke seeks reversal of the Board's decision with respect to the subcontractor clause.

We shall discuss first the critical issue of these cases, *viz.* the scope of the construction industry proviso as applied to the subcontractor clauses involved in each case. Thereafter the remaining issues pertinent to each case will be addressed.

## II.

### SCOPE OF THE CONSTRUCTION INDUSTRY PROVISO

Our analysis will proceed as did that of the Board. That is, we shall initially deter-

---

4. The proposed clause provides:

   The Contractor agrees that neither he nor any of his subcontractors on the jobsite will subcontract any work to be done at the site of construction, alteration, painting or repair of a building, structure or other work (including quarries, rock, sand and gravel plants, asphalt plants, ready-mix concrete plants, established on or adjacent to the jobsite to process or supply materials for the convenience of the Contractor for jobsite use) except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate Union, or subordinate body signatory to this Agreement.

   The proposed agreement also contains an alternative subcontractor clause, applicable in the event that the principal clause should be invalidated, which would prevent subcontracting with any firm unless the firm's employees belong to a union and unless the subcontractor agrees to comply with the full terms of the labor agreement between Woelke and Carpenters. We accept the Board's conclusion that the alternative provision is merely a disguised union signatory clause, since in practice only a subcontractor affiliated with Carpenters could satisfy its requirements, some of which are unrelated to any legitimate primary interest of the bargaining employees.

5. Section 8(b)(4)(i) and (ii)(A) provides:

   It shall be an unfair labor practice for a labor organization or its agents—

   \* \* \* \* \* \*

   (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is:

   (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by section 8(e); . . .

   29 U.S.C. § 158(b)(4)(i) and (ii)(A) (1976).

6. Section 8(b)(1)(B) provides:

   It shall be an unfair labor practice for a labor organization or its agents—

   (1) to restrain or coerce . . . (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances; . . .

   29 U.S.C. § 158(b)(1)(B) (1976).

mine whether these clauses fall within the general proscription of section 8(e) and, inasmuch as we agree with the Board's conclusions that section 8(e) does proscribe these clauses, we shall then determine whether the clauses are, nonetheless, protected by the construction industry proviso. As already indicated, our conclusion with respect to the scope of the proviso differs from that of the Board.

A. *Does Section 8(e) Proscribe These Clauses?*

■ The subcontractor clauses in these cases require that the employer not do business with another employer unless that employer has a labor agreement with the signatory union. Reading section 8(e) literally there is no doubt but that section 8(e) proscribes such clauses. The problem is not that simple, however. In *National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), the Supreme Court read into section 8(e) a distinction between primary and secondary objectives. An agreement which advances only primary objectives of the bargaining employees, such as preserving work opportunities, is not unlawful. Thus, a court must consider:

> . . . whether, under all the surrounding circumstances, the Union's objective was preservation of work for [the contracting employer's] employees, or whether the agreements . . . were tactically calculated to satisfy union objectives elsewhere. Were the latter the case [the contracting employer] . . . would be a neutral bystander, and the agreement . . . would, within the intent of Congress, become secondary. There need not be an actual dispute with the boycotted employer . . . for the activity to fall within this category, so long as the tactical object of the agreement and its maintenance is that employer, or benefits to other than the boycotting employees of the primary employer thus making the agreement or boycott

secondary in its aim. The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-a-vis* his own employees.

*Id.* at 644–45, 87 S.Ct. at 1268, 1269 (citations omitted).

■ Applying this standard, this court has recognized that a union signatory clause—as opposed to a union or area standards clause, which merely requires that the employees of subcontractors work under the same terms and conditions as those enjoyed by union members—is normally secondary in nature. *Griffith Co. v. NLRB,* 545 F.2d 1194, 1199 (9th Cir. 1976), *cert. denied,* 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 125 (1977). As the Second Circuit observed in *NLRB v. National Maritime Union,* 486 F.2d 907, 913 (2d Cir. 1973), *cert. denied,* 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974): "If the clause is a union signatory clause, the union has an interest, independent of the interests of the employees being represented, in furthering its own organizational ends or in protecting the interests of its other bargaining units."

Nor can these clauses be regarded as valid work preservation provisions. They do not assure work opportunities for employees in the respective work units, i. e., employees of AGC or of Woelke; rather, they operate for the general benefit of the respective unions. Hence, neither provision is directed to "the labor relations of the contracting employer *vis-a-vis* his own employees." *National Woodwork Manufacturers,* 386 U.S. at 645, 87 S.Ct. at 1268, 1269. We agree with the Board, therefore, that the subcontractor clauses fall within the general prohibition of section 8(e).

B. *Does the Construction Industry Proviso Authorize These Clauses?*

1. *The Interpretation Required by Connell Construction Co.*

■ In determining whether these subcontractor clauses are protected by the con-

struction industry proviso, we encounter the Supreme Court's decision in *Connell Construction Co. v. Plumbers Local 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). There the union, as a result of picketing, had obtained a subcontractor agreement with a general building contractor even though the union did not represent or seek to represent the contractor's own employees. When the contractor challenged the agreement under the Sherman Act, the union defended, in part, by arguing that the agreement was expressly authorized by the construction industry proviso. Declaring that "[section] 8(e) must be interpreted in light of the statutory setting and the circumstances surrounding its enactment," *id.* at 628, 95 S.Ct. at 1838, the Supreme Court observed that the section was part of a program enacted to limit "top-down" organizing campaigns. The construction industry proviso, though an exception to the section's general proscription, should be construed so as not to undermine that objective. *Id.* at 628–33, 95 S.Ct. 1830. The Court concluded that the subcontractor clause in that case was not covered by the proviso. It expressed its holding in the following manner:

> "We therefore hold that this agreement, which is outside the context of a collective-bargaining relationship and not restricted to a particular jobsite, but which nonetheless obligates Connell to subcontract work only of firms that have a contract with Local 100, may be the

basis of a federal antitrust suit because it has a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions."

*Id.* at 635, 95 S.Ct. at 1841.

The Board in the cases here being reviewed emphasized heavily the Supreme Court's reliance on the absence of a collective bargaining relationship. Where this relationship exists it held union signatory clauses were within the construction industry proviso. The Board stated:

> "The bottom line of the Court's opinion, as we construe it, is that the construction industry proviso to Section 8(e) permits subcontracting clauses such as those here in the context of a collective bargaining relationship, and possibly without such a relationship if the clauses are aimed at avoiding the Denver Building Trades [*NLRB v. Denver Building Trades*, 341 U.S. 675 [71 S.Ct. 943, 95 L.Ed. 1284] (1951)] problems."[7]

We disagree. We hold that the construction industry proviso extends shelter only when a collective bargaining relationship exists and even then only when the employer or his subcontractor has employees who are members of the signatory union at work at some time at the jobsite at which the employer wishes to engage a nonunion subcontractor. It follows that under our holding a general contractor, who

7. The unions and the Board purport to find support for this interpretation of *Connell* in *California Dump Truck Owners Ass'n v. Associated General Contractors of America*, 562 F.2d 607 (9th Cir. 1977). Declining to find challenged provisions of a labor agreement unlawful under the antitrust statutes, this court in *Dump Truck* distinguished *Connell* with the observation that in *Connell* no collective bargaining relationship had existed. *Id.* at 613. However, *Dump Truck* did not involve interpretation of section 8(e), and its quotation from *Connell* was taken from a section of the *Connell* opinion which was not concerned with section 8(e). Moreover, the provision challenged in *Dump Truck* was not a union signatory clause; the provision did not prohibit employers from using nonunion subcontractors

but merely required that such subcontractors receive a rate of pay not less than that of union employees, and that the union be notified when a nonunion subcontractor was employed. *Id.*

We are not aware, moreover, of any decision of any other court of appeals which has read *Connell* as construing the construction industry proviso so as to protect all subcontractor agreements made in a collective bargaining context. The district courts which have considered the question have reached contrary conclusions. *Compare, e. g., Long v. Floorcraft Carpet Co.*, 82 Labor Cases ¶ 10,044, p. 16,151 (D.Ore.1977), *with In re Bullard Contracting Corp.*, 464 F.Supp. 312 (W.D.N.Y.1979).

does not use at any time on a particular jobsite his employees who are members of the signatory union, and does not engage subcontractors whose employees are members of the signatory union, can engage nonunion subcontractors to perform work on that particular jobsite that otherwise would be done by members of the signatory union. To do so would not, in our opinion, violate a valid union signatory clause. To hold otherwise extends the construction industry proviso beyond the limits we attribute to *Connell.*

■ Our holding recognizes the validity of a provision in a collective bargaining agreement that with respect to any particular jobsite will preclude the possibility of members of the signatory union being required to share work with nonunion workers. Under a provision of this sort the employment of one member of the signatory union on the jobsite assures that all relevant work on that jobsite will be done by signatory union members. We believe this is a more accurate reading of *Connell's* holding than that of the Board.

We acknowledge that the teaching of *Connell,* as applied to the issue we are considering, is not unambiguous. The Court stated that the construction industry proviso applies only to work performed at the jobsite and then added, quoting *Drivers Local 695 v. NLRB,* 124 U.S.App.D.C. 93, 99, 361 F.2d 547, 553 (D.C.Cir.1966), that some courts had assigned the proviso the "even narrower function" of alleviating " 'the frictions that may arise when union men work continuously alongside nonunion men on the same construction site.' " *Connell,* 421 U.S. at 630, 95 S.Ct. at 1839. The Court's statement left open this "even narrower" view of the proviso's scope. However, since the subcontractor agreement in *Connell* occurred outside the collective bargaining context altogether, the Court was not required to decide whether and under what circumstances a subcontractor clause contained in a valid labor agreement would receive the protection of the proviso. What

*Connell* left unanswered we must confront and answer.

*2. Reasons In Support of Our Holding*

■ We believe our response is supported by the proviso's background and statutory setting. Section 8(e) was enacted as part of the Labor-Management Reporting and Disclosure Act of 1959. The section was designed, as the Supreme Court noted in *Connell,* to strengthen the prohibition in section 8(b)(4) against secondary activities by forbidding agreements which might be used to circumvent that section's ban on the use of economic coercion for secondary objectives. *Id.* at 628, 95 S.Ct. 1830. However, the prohibition in section 8(e) against hot cargo agreements was made subject to two exceptions: a broad exemption for the garment industry, and the more limited exception for the construction industry.

The unions and the Board contend that, at least with respect to agreements made within the context of collective bargaining, the proviso should be given the expansive scope which its literal terms suggest. Their argument can be stated syllogistically: At the time the proviso was enacted, the union signatory subcontractor provisions were lawful. The proviso was intended to preserve in the construction industry the law as it then existed. Hence, the proviso was intended, and should be construed, to protect subcontractor provisions.

The difficulty with this argument is that neither of the premises can be accepted without qualification. In 1959, when section 8(e) was enacted, the lawfulness and permissible scope of subcontractor agreements had not been conclusively determined. *Local 1976, United Brotherhood of Carpenters v. NLRB,* 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed. 1186 (1958), the so-called *Sand Door* case which in the unions' view defined the state of the law at that time, involved an agreement forbidding the use of nonunion material, not a subcontractor provision. Moreover, the issue in *Sand Door* was whether union picketing and coercion de-

signed to enforce a hot cargo provision was unlawful under section 8(b)(4), and the Court, although it indicated that a hot cargo clause was not *prima facie* evidence of illegal coercion under section 8(b)(4), *id.* at 108, expressly declined to consider "the invalidity of hot cargo provisions as such." *Id.* at 107, 78 S.Ct. at 1020. Thus, the lawfulness of union signatory clauses such as those challenged here was not determined in *Sand Door.*

Furthermore, even if subcontractor clauses were lawful prior to the passage of the Labor-Management Reporting and Disclosure Act, it is unclear to what extent the construction industry proviso was intended to preserve the then current law. The unions rely upon statements made by Senator Kennedy and an extract from the Conference Report which suggest that the proviso would not change the law of the *Sand Door* decision. Yet in explicitly limiting the proviso's protection to jobsite work, Congress adopted a restriction which was never mentioned in *Sand Door.* Indeed, in the same paragraph which indicates that the law of *Sand Door* would be preserved, the Conference Report states that the proviso would not protect "agreements relating to supplies or other products or materials . . . delivered on the site of the construction," which was precisely the kind of agreement at issue, and allegedly declared to be lawful, in *Sand Door.* H.R.Rep.No. 1147, 86th Cong., 1st Sess. 39, U.S.Code Cong. & Admin.News 1959, pp. 2318, 2511, *reprinted in* I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 943 (1959). Hence, the broad assertion that the construction industry proviso was designed to leave the law unchanged is inaccurate. Congress may have intended to preserve existing law within the scope of the proviso. That proposition, however, begs rather than answers the question of what the proper scope of the proviso is.

We must, therefore, look to the purpose Congress sought to serve by enacting an exception for the construction industry. In *ACCO Construction Equipment, Inc. v. NLRB*, 511 F.2d 848, 851 (9th Cir. 1975), this court surveyed the legislative history of section 8(e) and concluded:

> Although the legislative history of the proviso is ofttimes vague and inconclusive, what does emerge is an underlying congressional concern with minimizing jobsite tension. In contrast to most other industries, a variety of craftsmen employed by different contractors and subcontractors work continuously side by side on construction projects. Where the employees of some are union members and the employees of others are not, there is a potential, or so Congress believed, for jobsite conflict. Hence, "the purpose of the section 8(e) proviso was to alleviate the frictions that may arise when union men work *continuously* alongside nonunion men on the same construction site." *Drivers, Salesmen, Etc., Local 695 v. NLRB*, 124 U.S.App.D.C. 93, 361 F.2d 547, 553 (1966) (emphasis added). What appears critical is that the potential for conflict is likely to arise only when the nonunion laborers are in frequent and relatively close contact with the union craftsmen.

The court's conclusion in *ACCO* is consistent with the Supreme Court's reasoning in *Connell. Connell* noted that the construction industry proviso resulted from efforts to overrule the holding of *NLRB v. Denver Building Trades Council*, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), in which the Supreme Court had ruled that union picketing which was intended to force a general construction contractor to terminate its contract with a nonunion subcontractor violated section 8(b)(4). *Connell*, 421 U.S. at 629, 95 S.Ct. 1830. The *Denver Building Trades* decision was objectionable because, as Justice Douglas had argued in dissent, "[a]ll the union asked was that union men not be compelled to work *alongside nonunion men on the same job." Denver Building Trades*, 341 U.S. at 692, 71 S.Ct. at 953 (emphasis added). Thus, the purpose of the proviso was to permit unions and construction employers to avoid the tension and discontent

that exists when members of a union are required to work on the same jobsite with nonunion workers of the same craft or trade.[8] Our holding permits the avoidance of precisely that source of tension and discontent.

■ We cannot extend the proviso's protection beyond the purpose for which the exemption was created without creating a shield of immunity for agreements which we believe Congress wished to prohibit. Hence, the purpose of the exception dictates its scope. A subcontractor clause in a contract with a particular union which flatly forbids the use of subcontractors who have no contract with the signatory union on jobsites, regardless of whether workers of the signatory union will also be employed on those sites, goes well beyond the kind of arrangement which the proviso was created to protect. If a general contractor assigns work on a construction site only to nonunion subcontractors, the problem of jobsite friction between union and nonunion employees of a particular craft or trade does not arise. Indeed, a general contractor that assigns no employees who are members of the signatory union to a particular construction project occupies the same position, with respect to that project and the signatory union, as the contractor in *Connell* which had no union employees at all. The fact that a contractor may employ signatory union personnel elsewhere is, for purposes of the proviso, irrelevant.

We find additional support for our interpretation of the construction industry exception in the proviso's statutory setting. Section 7 of the Act, 29 U.S.C. § 157, pro-

vides, with limited exceptions, that employees have the right to refrain from any or all union activities. In addition, if employees choose to unionize, they have the right to bargain "through representatives of their own choosing . . ." Although section 8(f) of the Act, 29 U.S.C. § 158(f), permits "pre-hire" labor agreements in the construction industry, that section does not override the workers' rights of self-determination. *Connell*, 421 U.S. at 632, 95 S.Ct. 1830. A union signatory subcontractor clause operates to force nonunion firms and their employees to submit to union representation in order to be eligible for subcontracting opportunities, thus undermining the rights established in section 7. The agreement between AGC and Engineers, for instance, forecloses to nonunion firms employment opportunities with any of 200 construction contractors throughout Oregon and southwest Washington. The potential coercive effect of such a provision is manifest. The clause is thus precisely the kind of instrument for "top-down" organizing which the Supreme Court condemned in *Connell*. *Id.* at 631, 632, 95 S.Ct. 1830. For those reasons, we believe that the position taken by the Board, which legitimates the use of such an organizing weapon by a union as long as the union has a collective bargaining relationship with the signatory employer, is improper.

## III.

### REMAINING ISSUES

Having decided the principal issue raised by these cases, we now consider the proper disposition of each of the cases before us.

---

8. The employer petitioners argue further that the proviso was not intended to protect *particular union* clauses, i. e., agreements which require that an employer's subcontractors belong not merely to a union, but to the union which is party to the labor agreement containing the subcontractor proviso. This interpretation is based upon several statements by Senators indicating that the proviso would protect agreements precluding the use of "nonunion" (or, in a single instance, "unorganized") subcontractors. The employer petitioners interpret the term "nonunion" to refer only to firms not belonging to any union, and then make the negative inference that the proviso does not

protect subcontractor clauses forbidding the use of firms which, though not associated with the signatory union, are not "nonunion" firms in this narrow sense. This inference is dubious at best and, in any event, the fragments of legislative history upon which these parties rely do not constitute conclusive evidence of the understanding of Congress as a whole. Moreover, this view of the exception would frustrate the purpose of the proviso, because jobsite friction might arise between members of competing unions as well as between union and nonunion workers. We therefore decline to take this restrictive view of the proviso's scope.

For the reasons elaborated in the preceding section, the subcontractor clause contained in the collective bargaining agreement between AGC and Engineers constitutes a violation of section 8(e). The clause in its present form, as section 8(e) provides, is unenforceable. Hence, we need not decide whether the agreement's self-help enforcement provision as applied to a lawful subcontractor clause would violate section 8(e).

The subcontractor provision proposed by Carpenters in negotiations with Woelke is also unlawful under section 8(e). Picketing engaged in by Carpenters in order to compel Woelke to accept the provision was thus a violation of section 8(b)(4)(i) and (ii)(A), and should have been enjoined by the Board. The Board's order is accordingly modified to enjoin Carpenters from picketing or using economic coercion for the purpose of inducing Woelke to enter into any agreement which contains such a provision. Our disposition of this issue makes it unnecessary to consider Woelke's additional contention that picketing intended to compel acceptance even of a lawful subcontractor clause is prohibited by section 8(b)(4)(i) and (ii)(A).

The Board requests enforcement of its order enjoining the use by Carpenters of picketing, strikes, or other coercion in order to compel Woelke to include within the bargaining unit foremen who are supervisors or Woelke's representatives for purposes of collective bargaining or the adjustment of grievances. Carpenters has not contested the Board's ruling that picketing or coercion used for this purpose constitutes a violation of section 8(b)(1)(B) of the Act. The Board's order with respect to this issue should be enforced.

The Board shall modify its orders in these cases to conform to the views expressed in this opinion, and those orders, as modified, are ordered enforced.

Enforced As Modified.